**UNITED STATES of America,**
**Plaintiff,**

v.

**Jose VERDUGO et al., Defendants.**

**Cr. No. 39987.**

United States District Court
N. D. California, S. D.

April 9, 1965.

Cecil F. Poole, U. S. Atty., by Zeppelin Wong, Asst. U. S. Atty., San Francisco, Cal., for plaintiff.

Murphy, Doran & Patterson, by William J. Murphy, San Francisco, Cal., for defendant.

HARRIS, Chief Judge.

Defendant was charged with a violation of the Narcotic Laws in a superseding Indictment (No. 39987). The defendant filed a timely motion under Rule 41(e), Rules of Criminal Procedure, seeking to suppress evidence and for the return of property.

Oral testimony was taken in support of the motion and the matter submitted on written briefs.

The issues created and presented by the defendant are substantially these:

(1) That the government's arresting officers failed to obtain a search warrant;

(2) That there was no consent to the entry and that it was unlawful;

(3) That the search was not conducted as an incident to a lawful arrest and was not reasonable nor valid;

(4) That the contraband narcotics were not found within the curtilage of the premises;

(5) That the conduct of the government agents and officers violated defendant's constitutional rights under the Escobedo and the Massiah decisions;

(6) That certain moneys found as a consequence of the unlawful search should be suppressed and returned.

It is conceded that the government agents and police officers were not armed, either with a warrant for the defendant's arrest or a search warrant. In this regard it is to be observed that a complaint charging Jose Verdugo, the defendant, with a violation of the narcotic laws committed on July 29, 1964, was filed with the U. S. Commissioner at San Francisco on September 30, 1964. On that day a Commissioner's warrant of arrest was issued. As will be disclosed in the detailed analysis of the facts, the events surrounding the defendant's arrest and the consequent search of the premises located at 1531 La Salle Street, took place in San Francisco on October 1, 1964.

Although the government contends that the agents went to the defendant's residence in order to execute an arrest warrant against Verdugo, the plain import of the testimony was that they were to look for the contraband and to make an arrest in order to get the same.[1]

1. Tr. pp. 86, 87; 139; 143.
(pp. 86, 87)
"Q. Now, did you have a warrant for Mr. Verdugo's arrest?
"A. I understand there was a warrant on file. I personally did not have one.
"Q. You were informed there was a warrant on file?
"A. Yes.

"Q. Were you also informed as to the date of the alleged violation that gave rise to the warrant?
"A. Yes, sir.
"Q. What was the date?
"A. I don't recall at this time what the date was.
"Q. Was it sometime in July?
"A. This sounds correct, July.

■ The further contention of the government that the wife of the defendant permitted access to the house and "invited" them in, is not supported by the testimony. Although there is a conflict, it is plainly inferable that the agents intruded themselves without her consent. The wife obviously bowed to a demonstration and show of authority, and there was no waiver either on her part or that of the defendant. The wife testified: "They said if I didn't let them do as they told me I could be arrested." (Tr. p. 108)

In Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436, the Court states:

> "Entry to defendant's living quarters, which was the beginning of the search, was demanded under the color of office. It was granted in submission to authority rather than as to an understanding and intentional waiver of a constitutional right. Cf. Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654."

The factual background is substantially as follows:

On the date mentioned at approximately 11 o'clock a. m. Agents Wong and Durel of the Bureau of Narcotics and Inspector Arrieta of the San Francisco Police Department arrived at defendant's residence. Mrs. Verdugo opened the door to inquire what the men wanted. Durel stated that they were looking for Jose Verdugo. She responded that he was not at home. The officers gained entrance in the manner already referred to.

The officers entered the dwelling and walked into the rooms, looked into the closets, under the bed and in the bathroom to determine if the defendant was at home. They made a thorough survey and search to determine whether any other persons were on the premises. Then another officer arrived and he walked through the house.

The agents thereupon stationed themselves in the home.

Mrs. Verdugo asked to use the phone to assist in finding her husband. She was refused. The officers would have prohibited her from leaving the premises if she had attempted to do so.[2]

As already observed the officers did not have a warrant, either for the arrest of Mrs. Verdugo or Jose Verdugo, nor were they in possession of a warrant justifying the search of the home.

At approximately 12:30 p. m. the defendant arrived, knocked on the door and was greeted by Agent Wong. Verdugo ordered the officers out of the house, but was immediately placed under arrest. He and his wife began conversing in Spanish, their native tongue, but were ordered to stop since Wong could not understand what they were saying.

The defendant, although not told what he was arrested for, was handcuffed to a chair to restrain his movements.[3]

The officers then commenced a second and more detailed search of the premises. All of the bureau drawers and cabinets were gone through. A suitcase and trunk were searched. During the course of the day as many as seven officers were in the Verdugo home.

In addition, the search resulted in overturned furniture, punched holes in the wallboard and the removal of all the house lightswitch covers.

---

"Q. This was October the 1st?
"A. Yes, sir.
"Q. Now, Officer, you said that you found the stash. That is what you were looking for, isn't it?
"A. Yes, sir.
"Q. Before you even came to the Verdugo residence your idea was to look for the stash?

"A. Yes, sir."
        \* \* \*
(p. 143)
" 'Stash' means a large quantity of contraband or narcotics."

2. Tr. p. 25.

3. Tr. pp. 30, 31.

At 3 p. m. four uniformed policemen came to take both Mr. and Mrs. Verdugo to jail.

The search was not concluded until 4:45 p. m. approximately six hours after the officers first came to the door to look for Jose Verdugo. The search revealed and the officers seized $7583 in currency which is the subject of this motion for return. A receipt for this money was given to Verdugo. In addition to the money, a quantity of heroin wrapped in cellulose material was found upon a 2′ x 4′ brace on a back fence.

Defendant contends that the contraband was not found within the curtilage. However, in view of the disposition that will be made of the case it is unnecessary to pass upon this point.

Demand for the return of the money was made the next day by defendant's assignee and was refused. This demand was made prior to any transaction between Agent Wong and the Bureau of Internal Revenue.[4]

The foregoing search and seizure was engaged in and conducted without a warrant, as already observed. The government maintains that it was proper since "incident to a lawful arrest," recognized as an exception in Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399. Manifestly, this contention cannot here be upheld.

■■ The Fourth Amendment forbids every search that is unreasonable and is construed liberally to safeguard the right of privacy, affording protection to the offenders and the law abiding. United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877. That Amendment, by requiring that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized," outlaws all general, exploratory searches and cannot be circumvented

under the guise of conducting a search "incident to a lawful arrest." Ker v. State of California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726. "Indeed, the informed and deliberate determinations of magistrates empowered to issue warrants as to what searches and seizures are permissible under the Constitution are to be preferred over the hurried action of officers and others who may happen to make arrests." Lefkowitz, supra.

■ The determination of what is a reasonable search is not to be determined by any fixed formula. The recurring question of the reasonableness of searches must find resolution in the facts and circumstances of each case. United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653. Unlike the search held lawful in Rabinowitz, the one here was conducted in the accused's home[5] and took place, in part, while he was absent therefrom. Contrary to Rabinowitz, here the search for evidence of crime was lengthy and recklessly thorough, resulting in the unlawful seizure of $7,583 belonging to Verdugo which is not alleged to have been used in the commission of this or any crime.

■■ Verdugo's activities had been the subject of investigation for at least two months before the federal agents chose to stage this seige of his home, admittedly in search of "stash." There was ample time to obtain a search warrant. No emergency existed and no explanation or excuse is offered by the government for proceeding without a warrant. Johnson v. United States, supra. Failure to procure a search warrant, though not itself determinative of the merits here, is an indication that the agents were unable to define with the required specificity the objects to be seized. As the Supreme Court stated in McDonald v. United States, 335 U.S. 451, 454, 69 S.Ct. 191, 193, 93 L.Ed. 153: "We will not assume that where a de-

4. Tr. p. 43.

5. Stricter requirements of what is reasonable may apply where a dwelling is searched. Davis v. United States, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453; Matthews v. Correa, 2 Cir., 135 F.2d 534.

fendant has been under surveillance for months, no search warrant could have been obtained."

The vice of this search and the reason for adherence to the exclusionary rule [6] in this case, moreover, is compelled by the total character of the intrusion of the authorities upon the home of this accused. During the afternoon of the search, the entire Verdugo family was placed in fear and their freedom of movement and speech unreasonably restrained. Their callers were likewise unnecessarily herded together and subjected to the strict police control of the premises. During that long afternoon between five and seven law enforcement officers were present, milling about, using the Verdugo telephone and ransacking the house in search of incriminating evidence. In truth, the Verdugo home was converted into a police sub-station and was not the sanctuary which the Fourth Amendment commands it shall remain.[7]

In view of the within disposition it is unnecessary to pass upon the further contention of defendant that the conduct of the government agents and officers was violative of the defendant's constitutional rights under Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, and Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246.

For the foregoing reasons, it is hereby ordered that the contraband seized in violation of the accused's constitutional rights must be, and the same hereby is, suppressed as evidence.

It is hereby further ordered that the money in the amount of $7583 seized and withheld by the Federal Agents and, in turn, delivered to the Internal Revenue Bureau, be returned to the defendant's assignee as his interest may appear.

6. Held to be the only effective sanction in securing Fourth Amendment Rights in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652.

7. From 7 to 11 peace officers and agents at one time or another entered or departed from the premises. (Tr. p. 39).