**UNITED STATES of America,**
**Appellee,**

v.

**Benjamin MAGLIANO, Anthony Nick Magliano, and Vincent DeSantis,**
**Appellants.**

**UNITED STATES of America,**
**Appellee,**

v.

**Benjamin MAGLIANO and Vincent DeSantis, Appellants.**

**Nos. 9273, 9308.**

United States Court of Appeals
Fourth Circuit.

Argued April 21, 1964.

Decided Sept. 22, 1964.

**818**

Everett L. Buckmaster, Baltimore, Md. (George W. White, Jr., Wilbert H. Sirota, and Buckmaster, White, Mindel & Clarke, Baltimore, Md., on brief), for appellant Benjamin Magliano.

Arnold M. Weiner and Joseph S. Kaufman, Baltimore, Md. (Paul A. Dorf, Baltimore, Md., on brief), for appellant Vincent DeSantis.

Michael DeFeo, Atty., Dept. of Justice (Herbert J. Miller, Jr., Asst. Atty. Gen., Philip Wilens, Atty., Dept. of Justice, and Thomas J. Kenney, U. S. Atty., on brief), for appellee.

Before HAYNSWORTH and BELL, Circuit Judges, and CRAVEN, District Judge.

HAYNSWORTH, Circuit Judge.

The two appellants and Anthony Nick Magliano, a brother of one of the appellants, were found guilty by the District Court, sitting without a jury, of a conspiracy to violate federal wagering tax laws and four substantive offenses under the revenue laws.[1] Harry Anapa was also named in the indictment as a co-conspirator, but was not indicted. Anthony Nick Magliano, hereinafter referred to as "Nick," has not appealed.

Each of the three defendants below was sentenced for a period of two years on the conspiracy count and given one-year sentences on counts 3 and 5, all sentences to run concurrently. Fines were imposed on the remaining two counts. After this appeal had been taken by two of the defendants, a "Corrected Judgment and Commitment" was filed in which the one-year sentences on the substantive counts were altered so that they ran consecutively, but concurrently with the two-year sentence on the conspiracy count. The corrected sentences were imposed outside the presence of the defendants and without notice to them.

We affirm the conviction of Benjamin Magliano, sometimes referred to as "Bennie Trotta," but with a reduction

---

1. Count No. 1—Conspiracy to commit an offense against the United States or to defraud the United States through violation of the federal wagering tax laws (See 18 U.S.C.A. § 371); Count No. 2—Receiving wagers without having paid special occupational tax (See 26 U.S.C.A. §§ 4411, 7262); Count No. 3—Failure to pay special occupational tax (See 26 U.S. C.A. §§ 4411, 4901, 7203); Count No. 4—Failure to register (See 26 U.S.C.A. §§ 4411, 4412, 7272); Count No. 5—Failure to supply required information (See 26 U.S.C.A. §§ 4412, 7203; 26 C.F. R. § 325.50). All substantive counts also included Aiding and Abetting (See 18 U.S.C.A. § 2).

in his sentence for reasons hereinafter stated. We think the conviction of De-Santis must be reversed.

The Government's case was founded principally upon the testimony of Richard J. Pozecki, an undercover agent for the Internal Revenue Service, and upon that of Harry Anapa, one of the alleged co-conspirators. They had been introduced to each other by the proprietor of Virgilio's Sandwich Shop in Baltimore. They had several conversations about the placing of wagers, and Anapa told Pozecki that he would obtain Bennie Trotta's "book" number for him, Bennie Trotta being the name used by the Appellant, Benjamin Magliano, in the trade. Anapa went to the Club Troc, operated by Trotta, where he made arrangements for the placement and handling of wagers. Based upon Anapa's assurances as to the minimum size of each bet and the weekly volume of bets he could produce from his customers, Trotta agreed to pay Anapa a twenty-five per cent commission, and Anapa was instructed by Trotta to settle all bets with him at the Club Troc. Trotta gave Anapa a telephone number which could be used in the placement of bets. It was later discovered by the agents that this number was unpublished, but was carried on the books of the telephone company in the name of Trotta's brother, Nick Magliano.

When the agents first undertook to use the number obtained by them through Anapa from Trotta, their proffered bets were declined. They reported this information to Anapa, who complained to Trotta. Trotta apologized for the inconvenience, explaining that his brother was in trouble, but that he would talk to the brother and the number could be used the next day. The next day the agents again attempted to place wagers by dialing the telephone number given them by Anapa, using the code word "Harry" to identify themselves as Anapa's customers, and their proffered bets were accepted. Their bets were net winners. Agent Pozecki went with Anapa to the Club Troc. There, Anapa spoke to Trotta, who then went into a backroom and returned with money representing the net proceeds of the agents' bets. This money Trotta gave to Anapa, who after leaving the Club Troc with Pozecki, turned it over to the agent as his winnings.

Later bets placed by the agents, under the procedural instructions received from Anapa, resulted in losses. They paid the losses to Anapa, who delivered the money to Trotta. Anapa wanted twenty-five per cent of those moneys as his commission, but Trotta refused payment, explaining that Anapa's commission was computed upon the book's net winnings after deducting all losses to Anapa's customers.

Thereafter, there were a number of changes in the telephone numbers to be used. The agents first learned of the first change from a woman answering the number first given them. She explained that Nick was not there and that the number had been changed. She gave them the new number to call, and when that was used, a person identifying himself as Nick answered the phone, and the agents recognized his voice as being the same person who had accepted their earlier wagers. This time, Nick refused to accept the wagers, explaining that "Bennie told me to stay out of it until after my trial." He went on to tell the agent that he had been arrested by federal agents the previous September, and that his trial was soon coming up. However, he gave the agents another number to use, and subsequent bets were placed over that number. Shortly after the agents had talked with Nick on the telephone, Anapa instructed them about the changes in the numbers to be used.

Meanwhile, Agent Pozecki had met the defendant DeSantis, and on several occasions he talked to, and on other occasions observed, DeSantis. DeSantis was supplying Virgilio, the proprietor of the sandwich shop, with telephone numbers to be used for the placement of bets. Some of these were the same numbers being supplied by Anapa for use by the agents, though Anapa, of course, did not realize that they were undercover agents. On two occasions DeSantis gave Pozecki

numbers to use, and two of those numbers were the same which the agents were using under Anapa's instructions, but two others were not. On one occasion DeSantis was seen collecting money from Virgilio which Virgilio had lost on a bet. DeSantis on one occasion told Pozecki that he knew Bennie Trotta, and on another occasion that he knew that Nick Magliano was engaged as a pickup man in baseball wagering.

■ The evidence is clearly sufficient to support the conviction of Benjamin Magliano (Trotta). He contends, without persuasion, that the evidence did not show that he was a "writer," "banker," or a person having a proprietary interest in the wagering operation within the meaning of United States v. Calamaro, 354 U.S. 351, 77 S.Ct. 1138, 1 L.Ed.2d 1394. We think it does.

■ We look at the evidence, of course, in the light most favorable to the verdict.[2] So viewed, it clearly warrants the inference that Trotta, at the very least, had a proprietary interest in the operation. He received from Anapa the losses of Anapa's customers, and he delivered to Anapa money with which to pay their winnings. It was he who negotiated with Anapa about the minimum size of the bets, the weekly volume to be placed and the commission to be earned. On one occasion he complained to Anapa that the size of the bets was lower than had been represented. He reprimanded his brother, Nick, for not accepting a bet, apologized when bets were not accepted, and made effective arrangements for the acceptance of subsequent bets. Anapa's summary reference to the "book" as Trotta's adds little to the evidence, but the testimony that Trotta was the man who settled the bets, made the arrangements and issued the instructions abundantly warrants the Court's

inference that, if he was not the sole banker, he had at least a proprietary interest in the business. That finding satisfies the requirements of Calamaro.

Trotta also questions the sufficiency of the evidence to show an attempt on his part willfully to evade federal tax laws. He correctly points out that, under the statutes, willfulness is an essential element of the offense, and unless there is actual knowledge of the requirements of the tax laws, there can be no willful intent to evade them.[3]

The record contains an ample basis for a finding that Trotta knew of the requirements of the revenue laws. His brother was under indictment and was about to be tried for a violation of those same revenue laws. Trotta told Anapa that his brother was in trouble and, for that reason, was being cautious. He, himself, did not disclose to Anapa the nature of the trouble the brother was in, but the brother, Nick, did do so. From this, the reasonable inference certainly arises that Nick's trouble, to which Trotta referred, was the same prosecution for violation of the wagering tax laws which Nick, himself, revealed. Otherwise, some unrelated trouble which Nick might have been in would not likely have occurred to Trotta as the obvious explanation for Nick's refusal to accept a bet when that fact was first reported to Trotta.

■ It may well be that Trotta's failure to procure the tax stamp and comply with the federal revenue laws was motivated primarily by fear of criminal prosecution under state statutes, but a finding of willfulness does not depend upon a determination of predominant motivation.[4] This is true as to the conspiracy counts as well as to the substantive counts.[5] Evidence of knowledge of the requirements of the taxing statutes,

2. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680.

3. United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381; Edwards v. United States, 5 Cir., 321 F.2d 324; Yarborough v. United States, 4 Cir., 230 F.2d 56, 61.

4. Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418.

5. Ingram v. United States, 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503.

combined with proof of failure to pay the tax and file the required information furnishes a basis for a finding of willfulness.

## II

While the evidence was quite sufficient to show the guilt of Trotta, it is insufficient to show the guilt of DeSantis. It may be, as the Government contends, that he also had a proprietary interest in the "book," but that is not shown by the testimony. The evidence shows nothing approaching a partnership between Trotta and DeSantis. The only reasonable inference from what appears in the record is that DeSantis, like Anapa, was a "pickup man," supplying telephone numbers to bettors for use in making wagers on "books" operated by others. On one occasion, DeSantis was seen picking up the money which had been lost by one of his betting customers, just as Anapa did. That does not warrant an inference that DeSantis, unlike Anapa, had a proprietary interest in the operation, nor does it tend to prove that he was a "writer." Receipt of a wager within the meaning of the statute means its effective acceptance. It applies to the person who accepts the betting proposal and agrees to pay if the customer should win.[6] Such a person, the "writer," is to be sharply distinguished from the runner, or "pickup man," who, among other things, may collect the money due on executed wagering contracts. Since the proof shows DeSantis to be no more than a "pickup man," his conviction on the substantive counts must be reversed.[7]

Since DeSantis has not been shown to have had a proprietary interest in the operation, his conviction on the conspiracy count can stand only upon proof that he knew the proprietor and the writer had not complied with the requirements of the taxing statutes. The evidence contains no such proof.

De Santis knew of the requirements of the federal statutes, for on one occasion he spoke of them to Pozecki. He expressed surprise over a published report of a raid upon a gambling operation, saying that he had thought that so long as the necessary tax stamps had been purchased the operation was immune from federal interference. This evidence, however, lends no support whatever to a finding that DeSantis knew the Magliano brothers had not complied with the requirements of federal law. The United States had the burden of proving not only that DeSantis knew of the requirements of the taxing statutes, but that the requirements had not been complied with by Trotta and Nick. The element of willfulness is equally lacking if one acts in the belief or upon the assumption that there has been compliance with the law's requirements as when one acts in total ignorance of those requirements.[8]

The only evidence on the point in the record completely fails to show that De Santis knew that Trotta and Nick Magliano were not in compliance with the federal requirements. On the contrary, in showing his knowledge or belief that other gamblers in the Baltimore area were complying with the federal laws, it is more consistent with an assumption upon his part that Trotta and Nick Magliano were also complying with those laws.

Thus the conviction of DeSantis on the conspiracy count must also fail.

## III

Trotta raises several other questions.

Trotta objects to the receipt in evidence of testimony regarding extrajudicial statements made by Anapa to Pozecki. Pozecki was permitted to testify, for instance, as to what Anapa told him of statements made by Trotta to Anapa. These statements of Anapa's, of course,

---

6. United States v. Calamaro, 354 U.S. 351, 77 S.Ct. 1138.

7. United States v. Calamaro, 354 U.S. 351, 77 S.Ct. 1138.

8. See Ingram v. United States, 360 U.S. 672, 79 S.Ct. 1314.

were admissible if they were those of a co-conspirator made in furtherance of the conspiracy. They, otherwise, would be barred under the hearsay rule. The evidentiary question thus turns upon the status of Anapa, who was not indicted, but who was alleged to have been a co-conspirator.

Anapa, as we have seen, was a "pick-up man." He had no proprietary interest in the business. He was not a "writer." He was not liable for the tax and was not required to file any information with the Internal Revenue Service. He could not have been convicted of any substantive offense.

■ That Anapa was guilty of no substantive offense does not preclude a conviction of him as a co-conspirator.[9] The crime of conspiracy is separate from the substantive offense, which is the object of the conspiracy.

Clearly, Anapa was a conspirator if he knew that the wagering business he was furthering and assisting was operated without compliance with the requirements of the federal statutes. We have overturned the conviction of De Santis because, while DeSantis knew of the requirements of the statutes, he was not shown to have known that they had not been fulfilled. Anapa, however, on cross examination by defense counsel, testified that he knew at the time he was violating the law. In the context of his testimony and of this federal prosecution for violation of federal law, it is clear that he was referring to federal, not state law, when he referred to his knowledge of his own violations. Thus, the proof as to Anapa is quite sufficient to supply the element of willfulness and to show that he was a co-conspirator. Had he been less cooperative, had he been indicted, he could have been convicted as such.

9. United States v. Rabinowich, 238 U.S. 78, 35 S.Ct. 682, 59 L.Ed. 1211; Williamson v. United States, 207 U.S. 425, 28 S.Ct. 163, 52 L.Ed. 278.

10. Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593; United

■ Since it is also plain that Anapa's extrajudicial statements were made in furtherance of the conspiracy at a time when the conspiracy was still in being, evidence of his statements was properly received and considered by the Court.[10]

## IV

Trotta also complains of statements made to the Court after the guilty verdicts had been received, but before the sentences had been imposed. In connection with the consideration of bail, the United States Attorney informed the Court that Anapa had received threatening telephone calls relating to his appearance as a witness for the Government and had been urged to falsify his testimony relating to Trotta. The prosecutor explained, however, that he was not accusing any one of the defendants, and that if he were able to prove that the threats and the attempts to have Anapa perjure himself were the acts of the defendants, he would have brought charges against them. He also explained that Anapa was involved in a series of other cases, and the threats may have come from defendants in those cases.

The probation report also contained reference to the threats to Anapa and the attempt to have him falsify his testimony. The probation officer had learned of those matters from the District Attorney, and of this the District Judge was informed.

The District Court has been given a wide latitude in the receipt and use of information as an aid to the sentencing process and in considering the propriety of bail for postconviction release. After conviction, everything of possible pertinency may be considered, though it has no competency as proof of what it purports to indicate.[11] The prosecution may not intentionally mislead the Court.

States v. Sapperstein, 4 Cir., 312 F.2d 694.

11. See Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337; Armpriester v. United States, 4 Cir., 256 F. 2d 294.

and the Court should not glaringly misread what is before it,[12] but there is no suggestion here that the Court was misinformed by the prosecutor, or, indeed, that the prosecutor was not entirely fair in his presentation of the information he had. There is no indication that the Court was misled in any way.

## V

The sentences imposed upon Trotta and his brother, Nick Magliano, however, were illegal in part. The substantive offenses of which they were charged were misdemeanors only, and the maximum sentence which could have been imposed upon conviction of any substantive offense was one year imprisonment, though two of the counts carried maximum prison sentences of one year each and two years confinement could have been required by having the sentences on those two counts run consecutively. However, 18 U.S.C.A. § 371 specifically provides that if the crime, the furtherance of which is the object of the conspiracy, is only a misdemeanor the maximum punishment upon conviction of conspiracy may not exceed the maximum punishment provided for the substantive offense. The two-year sentences on the conspiracy count were thus illegal, for, under the statute, one year was the maximum which could have been imposed. The fact that the defendants were convicted on more than one susbtantive count would not appear to alter the rule. The conspiracy is a single crime whether it contemplates one or more substantive offenses.[13]

It was apparently for that reason that the Court undertook to correct the sentences by making the prison terms on the substantive counts run consecutively rather than concurrently with each other. Done in the absence of the defendants after Nick Magliano had begun the service of his sentences and after the appeal had been taken in this case, the Government concedes the Judge's effort to correct the sentence was unavailing and invalid.

Under some circumstances, it has been thought appropriate in this kind of situation to remand the case for resentencing.[14] In other situations, it has been thought preferable for the appellate court to strike out the excess and leave in effect the original sentence to the extent to which it is valid.[15] This, we think the preferred procedure here.

Nick Magliano, who has not appealed and who is presently serving his sentences, must be held to have commenced the service of each of the three prison sentences imposed upon him.[16] A change in the sentences to run consecutively rather than concurrently, an increase in the sentence,[17] would not be permissible under any circumstances as to Nick Magliano. He may file a motion under Rule 35 to correct his sentence by striking out the excess imposed upon him on the conspiracy count. He would be entitled to have that motion granted.[18] His brother, who took this appeal, should not be left in a more unfavorable situation for having done so.

We, therefore, strike the attempted correction of the original sentences, reduce the original sentence of Trotta on the conspiracy count to the one year maximum which might have been im-

---

12. Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690.

13. See Williams v. United States, 5 Cir., 238 F.2d 215.

14. Kitt v. United States, 4 Cir., 138 F.2d 842.

15. Kennedy v. United States, 9 Cir., 330 F.2d 26; Duggins v. United States, 6 Cir., 240 F.2d 479; United States v. Chiarella, 2 Cir., 214 F.2d 838.

16. Puccinelli v. United States, 9 Cir., 5 F. 2d 6.

17. Duggins v. United States, 6 Cir., 240 F.2d 479; Rutledge v. United States, 5 Cir., 146 F.2d 199.

18. United States v. Benz, 282 U.S. 304, 51 S.Ct. 113, 75 L.Ed. 354; Crowe v. United States, 6 Cir., 200 F.2d 526; Wilson v. Bell, 6 Cir., 137 F.2d 716.

posed, and, with Trotta's sentence thus modified, we affirm his conviction. The conviction of DeSantis is reversed.

Modified and affirmed in part; reversed in part.