**UNITED STATES of America,**
**Libelant,**

v.

**UNITED STATES CURRENCY IN the AMOUNT OF $2,813.37, One Victor Adding Machine, Serial No. 1504-074, One Westinghouse Portable Transistor Radio, Serial No. 2304, Respondent.**

**Civ. No. 8100.**

United States District Court
M. D. Pennsylvania.

Dec. 29, 1966.

Mussoline in which he alleges that he is the owner of the property sought to be forfeited; that it was not used or intended for use in the business of accepting wagers; that the libel filed by the Government should be dismissed and the property returned to him forthwith. A hearing was held October 12, 1966, testimony taken, and the matter is now ripe for determination.

Before proceeding to the merits, certain guidelines should be recognized and applied. A forfeiture proceeding under § 7302 is one of a civil nature as distinguished from a criminal case and the measure of proof required from the Government is merely a preponderance of the evidence. United States v. $4,298.80, 179 F.Supp. 251 (D.C.Md. 1959). While forfeitures are not favored under the law, nevertheless, revenue statutes are construed and applied less narrowly than penal statutes. United States v. Ryan, 284 U.S. 167, 52 S.Ct. 65, 76 L.Ed. 224 (1931). Moreover, an acquittal of the criminal offense would not bar the forfeiture, as an acquittal in a criminal action is considered merely an adjudication that the proof was not sufficient to overcome all reasonable doubt of the guilt of the accused. United States v. Burch, 294 F.2d 1 (5th Cir. 1961); United States v. Currency in Total Amount of $2,223.40, 157 F.Supp. 300 (N.D.N.Y.1957). This rule of law is mentioned at this point inasmuch as the same Dominic Mussoline was indicted in two counts and charged with violation of Title 26 U.S.C. § 7203, in that he engaged in the business of accepting wagers and willfully, knowingly and unlawfully failed to pay the Special Occupational Tax as required under Title 26 U.S.C. § 4411, and failed to register with the District Director as required under Title 26 U.S.C. § 4412. A motion for judgment of acquittal was granted on the ground that the Government's proof was insufficient to show that Mussoline knew of the necessity of registering and purchasing a $50 gambling tax stamp

Julius Altman, Asst. U. S. Atty., Scranton, Pa., for petitioner.

Albert Mackarey, Michael Shehadi, Scranton, Pa., James S. Palermo, Hazleton, Pa., for respondent.

## MEMORANDUM

NEALON, District Judge.

In this action, the Government, pursuant to the provisions of Title 26 U.S.C. § 7302, seeks forfeiture of $2,813.37 in United States currency, one Victor Adding Machine and one Westinghouse Transistor Radio, allegedly being property intended for use in the furtherance of the business of accepting wagers in violation of the Internal Revenue Code [1]. An answer has been filed by one Dominic

---

1. See 26 U.S.C. §§ 4411, 4412.

and that such knowledge is a necessary prerequisite to a conviction for violating the Federal tax laws. See United States v. Russo, 335 F.2d 299 (7th Cir. 1964); United States v. Magliano, 336 F.2d 817 (4th Cir. 1964); United States v. McGonigal, 214 F.Supp. 621 (D.C.Del.1963). Mussoline was acquitted on the criminal charge, not because there was insufficient evidence of gambling activity, but because there was insufficient evidence to show that he had knowledge of the tax obligation. This analysis demonstrates the wisdom of the principle that acquittal of the criminal offense does not bar the forfeiture proceedings because the issues involved are quite different. In one, the issue is the criminal responsibility of a named defendant; in the other, the issue is the civil determination of whether certain property was intended for use in violation of the Internal Revenue Code. The latter is obviously an in rem proceeding. United States v. Burch (supra).

 Section 7302 provides, inter alia:

"It shall be unlawful to have or possess any property intended for use in violating the provisions of the internal revenue laws * * *" and further, that " * * * [a] search warrant may issue * * * for the seizure of such property * * *"

The property involved herein having been seized by the Government and Mussoline having admitted that this property was his, the only question remaining is whether such property was intended for use in violating the internal revenue laws. The word "intended" in the statute does not refer to intention to evade tax, but to the use to which the property is to be put. United States v. Five (5) Coin-Operated Gaming Devices and Contents, 154 F.Supp. 731 (D.C.Md.1957), affirmed 4 Cir., 253 F.2d 794. Of course, proof of the intended use need not be direct, but may be established by circumstantial evidence. United States v. One 1955 Mercury Sedan, 242 F.2d 429 (4th Cir. 1957).

Turning to the facts of this case, it would call for a ludicrous and naive evaluation of the evidence for one to conclude that the premises involved herein, 113–115 East Diamond Avenue, Hazleton, Pennsylvania, was not being used for the furtherance of the business of accepting wagers. The evidence militating such a conclusion is overwhelming. It is as follows:

The premises at 113–115 East Diamond Avenue, Hazleton, Pennsylvania, is owned by Dominic Mussoline and Helen Mussoline, his wife. There are two telephones on that portion of the premises with which we are concerned and the dialing numbers were identified as 455–2525 and 455–5083. Mr. William Connors, Jr., a Special Agent with the Internal Revenue Service, dialed the number 455–2525 on five occasions and placed bets on horse races—once with a man who identified himself as "Lefty" and four times with a man called "Junior." On May 4, 1963, Kentucky Derby Day, agents of the Internal Revenue Service entered the premises on East Diamond Avenue in the process of executing a search warrant. To accomplish this the agents knocked down a large, locked and reinforced door and broke through the wall. Mussoline was observed emerging from the basement through a trap door stairway and the agents, upon investigation in the basement, detected papers burning in the stoker. Among the items seized, some of which are not important here, were a copy of the American Racing Manual; fourteen issues of the horse racing newspaper, The Morning Telegraph, including the issue of May 4, 1963, which contained markings; a telephone index; scratch pads; two slips of paper on the top of a wooden desk which the agents testified contained markings of horse race bets, e. g., "Affectionately 10, Never Bend 10/10, Bonjour 5, No Robbery 2 2 2"; three slips in the center drawer of a steel desk which contained markings of horse race bets, e. g., "7 NY Saidam 2 2 X, 7 Ch Bonjour X 2 X", and four slips in the center drawer of the wooden desk which contained markings of horse race bets, e. g., "7 Ch Bonjour 2 2 X, 7 Ch No Robbery 6 X X" and which were

held together with $149.00 in cash by a clip and rubber band. In a locked safe on the premises the agents located the sum of $2,482.01, and wrapped around this money, and secured with a rubber band, was a slip which appeared to contain the following names and numbers:

```
 1900 Apr. 26
 +325 — Bonzo
 + 45 — Nick
 + 10 — Len (Rice)
 ─────
 2280
 − 60 — Jr. Sal. (Apr. 28.)
 ─────
 2220
 − 41 — Dom. Cer.
 ─────
 2179
 + 5 — Larry Con.
 ─────
 2184
 +150 — Gabe
 + 19 — P. Col
 ─────
 2353
 − 14 — Mag.
 ─────
 2339
 + 16 — Tony
 ─────
 2355
 − 95 — Mag.
 ─────
 2260
 + 16 — P. Col.
 + 75 — Mrs. G1.
 ─────
 2351
 − 13 — Lenny (Com)
 ─────
 2338
 + 85 — Mike Pam.
 + 20 — Wang.
 ─────
 2443
```

With reference to this slip which was wrapped around the money in the safe, the agents traced most of the names contained thereon to the betting slips found in and on the wooden and steel desks, in the following manner:

(a) On one of the betting slips found on top of the wooden desk, the name "Bonzo" appears and it is followed by markings and notations including, inter alia, "5 G Johnstown Flood 3, 3 P Remunerate 3 * * *";

(b) On one of the betting slips found in the steel desk, the name "Nick" appears and it is followed by markings and notations including, inter alia, " * * * 7 P Poppyjay 2 2 X, 7 NY Saidam 2 2 X, 7 Ch Bonjour X 2 X * * *";

(c) On one of the betting slips found in the center drawer of the wooden desk, the name "Dom" appears followed by the notation "No Robbery 3 2 X";

(d) On one of the betting slips found in the center drawer of the wooden desk, the name "Larry Con" appears followed by the notation "5 NY Barletta 2 X X";

(e) On one of the betting slips found on top of the wooden desk, the name "Mag" appears and is followed by the notation "8 P War Council & Gaelic Lad 2 5 X X";

(f) On one of the bettings slips found in the center drawer of the wooden desk, the name "Tony" appears followed by the notation "7 Ch Bonjour 2 2 X, 7 No Robbery 6 X X, 2 G Redbow 3 X X, 6 County Charma 3 X X";

(g) On one of the betting slips found in the center drawer of the wooden desk, the name "Mrs G1" appears followed by the notation "Investor 2 X X, Chateaugay 2 X X, 7 NY Hitting Away, (illegible), 8 P War Council (M.G.)", and

(h) On one of the betting slips found on top of the wooden desk, the name "Mike" appears followed by a notation which includes, inter alia, "1 NY Electioneer 5, Deer Crossing 5) 2 D D * * *".

With regard to the notations hereinabove enumerated the listings of horse races in The Morning Telegraph Racing Newspaper for Saturday, May 4, 1963, revealed the following:

(a) A horse named "Johnstown Flood" was entered in the 5th race at Garden State Race Track, and a horse named "Remunerate" was entered in the 3rd race at Pimlico Race Track;

(b) A horse named "Poppy Jay" was entered in the 7th race at Pimlico Race Track, a horse named "Saidam"

was entered in the 7th race at New York's Aqueduct Race Track, and a horse named "Bonjour" was entered in the 7th race at Churchill Downs Race Track;

(c) A horse named "No Robbery" was entered in the 7th race at Churchill Downs Race Track;

(d) A horse named "Barletta" was entered in the 5th race at New York's Aqueduct Race Track;

(e) A horse named "War Council" and a horse named "Gaelic Lad" were entered in the 8th race at Pimlico Race Track;

(f) A horse named "Redbow" was entered in the 2nd race at Garden State Race Track, and a horse named "County Chairman" was entered in the 6th race at Garden State Race Track;

(g) A horse named "Investor" was entered in the 7th race at Churchill Downs Race Track, as was a horse named "Chateaugay" and a horse named "Hitting Away" was entered in the 7th race at New York's Aqueduct Race Track, and

(h) A horse named "Electioneer" was entered in the 1st race at New York's Aqueduct Race Track, and a horse named "Deer Crossing" was entered in the 2nd race at the same track.

Moreover, while on the premises, the agents answered numerous calls on both telephones in which the callers attempted to place bets on certain horses running at different race tracks. Mussoline was also searched and relieved of $182.36, which was taken from his trousers pocket. A slip of paper, allegedly containing gambling information, was taken from his wallet. As previously mentioned, it would require an inordinate straining of one's imagination to conclude that a gambling operation was not in process at the East Diamond Avenue premises. Consequently, it being conceded that no one registered with the District Director or paid the Special Occupational Tax in order to engage in the business of accepting wagers at the East Diamond Avenue address, we move to the sole remaining issue in this case—was the money seized intended for use in this operation?

The Government's evidence demonstrates clearly that horse race bets were placed by the agents over the telephone; that betting slips, all of which concerned horse races being run that very day, were in great display on the premises; that the names of individual bettors or runners were contained on the betting slips identifying the horses and the race tracks; that many of the names so appearing on the betting slips were also contained on the slip attached to the money in the safe; that betting slips were physically attached to the $149.00 found in the center drawer of the steel desk; that the room abounded with copies of the horse racing newspaper, The Morning Telegraph; and finally, while the raid was actually in progress, the agents answered the telephones and marked down bets on horses running that day.

Against this background of testimonial and documentary proof, Mussoline testified that the money in the safe represented rental and trucking receipts and subtractions therefrom represented loans made to members of a Social Club also located in the front of the premises. If we are to accept his story, then most of his tenants, customers and social club friends are also patrons of the gambling establishment as their names appear both on his "business and loan account slip", as well as on the gambling slips found on the premises. This coincidence is so unlikely it deserves little comment. We prefer to accept the logical and plausible explanation that the money in the safe represented the amount of cash needed to meet the demands of a "bookie" operation and the slip attached thereto showed collections and payoffs.

█ Therefore, I conclude that on May 4, 1963, the premises at 113–115 East Diamond Avenue, Hazleton, Pennsylvania, was being used in furtherance of the business of accepting wagers; that in order to finance an operation of this size it was necessary to have an adequate

amount of cash on hand; that the $2,-482.01 in cash found in the safe was intended for use in the business of accepting wagers and should be forfeited to the United States; that the $149.00 in cash attached to the betting slips found in the center drawer of the steel desk was intended for use in the business of accepting wagers and should be forfeited to the United States; that the evidence is insufficient to show that the $182.36 found on Mussoline's person was intended for use in the business of accepting wagers and this money is to be returned to him; that the evidence is insufficient to show that the Victor Adding Machine and the Westinghouse Transistor Radio were intended for use in the business of accepting wagers and they are to be returned to Mussoline.

The sum of $2,631.01 is forfeited to the United States. Judgment is entered in favor of the plaintiff in the amount of $2,631.01.