67 F.3d 299
 76 A.F.T.R.2d 95-6803
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Jimmy T. BARKLEY, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 94-5726.
 United States Court of Appeals, Sixth Circuit.
 Oct. 3, 1995.
 
 Before: MILBURN, GUY, and SUHRHEINRICH, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiff Jimmy T. Barkley appeals the district court's order granting defendant United States of America's motion for summary judgment and denying plaintiff's cross-motion for summary judgment in plaintiff's action to recover and abate federal wagering tax and interest assessed against him pursuant to 26 U.S.C. Secs. 4401 and 4411 and to abate the penalty assessed against him pursuant to 26 U.S.C. Sec. 6651(a)(1)-(2). On appeal, the issues are (1) whether the district court correctly determined that plaintiff was engaged in the business of accepting wagers within the meaning of 26 U.S.C. Sec. 4401 during the period from September 1984 to March 1985 based on plaintiff's prior guilty plea to violating the federal anti-professional gambling act, 18 U.S.C. Sec. 1955, during that period; (2) whether the district court correctly determined that plaintiff was engaged in the business of accepting wagers during the period from September 1982 to December 1983, a period not covered by the guilty plea; and (3) whether the district court correctly determined that the government was entitled to summary judgment on its wagering excise tax assessment against plaintiff both because plaintiff failed to rebut the presumptive correctness of that assessment and because the assessment was reasonable. For the reasons that follow, we reverse and remand.
 
 I.
 A.
 
 2
 In March 1985, pursuant to a search warrant, federal law enforcement officials raided the home of William C. Merritt and seized numerous items of bookmaking paraphernalia, including betting slips, settlement sheets, and line sheets on basketball games and horse races. Following this raid, thirty individuals, including plaintiff Barkley, were arrested on felony and misdemeanor gambling charges. Barkley was indicted for violating the federal anti-gambling statute, 18 U.S.C. Sec. 1955. The indictment charged that Barkley "did conduct, finance, manage, supervise, direct and own an illegal gambling business" from "a point in time unknown to the grand jury before on or about September 1, 1984 and continuously thereafter, up to and including on or about March 23, 1985." J.A. 88. On February 12, 1986, Barkley pled guilty to the charges against him. Following his sentencing, he moved for a reduction of his fine.
 
 
 3
 Subsequently, the Internal Revenue Service ("IRS") assessed wagering excise taxes and penalties against Barkley based on its perception of Barkley's role in the gambling operation. The affidavits, depositions, and other testimony submitted in connection with this appeal fail, however, to clearly describe the gambling operation's structure. Relevant testimony regarding the operation was provided by Barkley, Merritt, Julius Kalmus, and Kenneth Stewart. In his deposition taken during discovery in this case, Barkley testified that his only involvement in the gambling operation was as a runner for Merritt. He said that he collected and paid out money on Merritt's behalf and that several times he loaned Merritt money. He also denied in his deposition that he was ever involved in a partnership with Kalmus. However, in his memorandum of points and authorities submitted September 22, 1986, in connection with his motion for reduction of fine, Barkley stated that he was in a partnership with Merritt, Stewart, and Burns. He further stated that he had an interest in the fruits of their bookmaking activities that was less than ten percent.
 
 
 4
 Conversely, Julius Kalmus testified at his deposition that he participated in an operation with Stewart and Barkley in which they "cut up the losses or profit." J.A. 140. As Kalmus described it, each of the men had his own players, and Kalmus took most of the bets over the telephone. In a statement to the IRS, Kalmus said that this partnership existed from September 1982 to December 1983 and that he had a twenty percent stake in the profits and losses. According to Kalmus, Barkley and Stewart assumed liability for the remaining eighty percent.
 
 
 5
 Stewart testified at his deposition that he was involved with Barkley from the fall of 1982 to March 1985, and that at different times during this period, Kalmus and Merritt accepted wagers on Stewart's behalf. Stewart repeatedly testified that he did not know the particulars of Barkley's involvement in the operation. Merritt submitted an affidavit stating that at no time did he or Barkley have any agreement to share bets or take bets on behalf of each other.
 
 
 6
 On May 6, 1991, based on its determination that Barkley was engaged in the business of accepting wagers from September 1982 to March 1985,[1] the IRS assessed against Barkley wagering excise taxes and interest pursuant to 26 U.S.C. Secs. 4401 and 4411 in the amount of $904,013.94 for his illegal gambling activities. The IRS also assessed against Barkley penalties of $203,403.13 pursuant to 26 U.S.C. Sec. 6651(a)(1)-(2).
 
 
 7
 Because Barkley kept no records of the gross wagers he accepted, the IRS was required to use the records confiscated from Merritt's home to calculate the taxes and penalties. These records only provided information about the month preceding the search, so the IRS used these records to calculate the daily average of the total wagers accepted during this month. It multiplied the daily average figure by the number of days during each month of the entire 24-month period on which betting was possible to obtain a monthly total. The IRS then multiplied these monthly totals by the applicable 2% tax rate under Section 4401 to determine Barkley's federal excise wagering tax for each month at issue.
 
 
 8
 Barkley paid $1,544 in partial satisfaction of the wagering tax assessment, and then in June 1991, he filed a timely claim for refund of this amount. The IRS took no action on the claim for refund.
 
 B.
 
 9
 On August 1, 1991, Barkley filed an action in district court seeking to recover $1,544 in wagering taxes paid by him, to abate federal excise tax and interest assessed against him pursuant to 26 U.S.C. Secs. 4401 and 4411, and to abate the penalty assessed against him pursuant to 26 U.S.C. Sec. 6651(a)(1) and (2). The government counterclaimed for the balance of its assessments against Barkley ($904,013.94 in wagering taxes and $203,403.13 in penalties). The parties' cross-motions for summary judgment were filed following discovery.
 
 
 10
 In its motion, the government alleged that Barkley, by virtue of his guilty plea, was collaterally estopped from denying that he was engaged in the business of accepting wagers from September 1984 to March 1985 within the meaning of I.R.C. Sec. 4401. The government further alleged that the assessments for the period at issue were presumptively correct and that plaintiff Barkley had failed to offer any evidence to rebut them.
 
 
 11
 Barkley contended in his motion that collateral estoppel did not apply and that his guilty plea did not conclusively establish his liability for wagering taxes from September 1984 to March 1985. He further contended that his guilty plea had no application outside this period and that the evidence did not show that he engaged in conduct that would establish his liability for the wagering taxes at issue. Finally, Barkley argued that the government's calculation of the amount of tax he owed was unreasonable and speculative.
 
 
 12
 On February 18, 1994, the district court granted the government's motion for summary judgment and denied plaintiff's cross-motion for summary judgment. The court concluded that the plaintiff's guilty plea collaterally estopped him from denying that he was a person engaged in the business of accepting wagers from September 1984 to March 1985, that deposition testimony established that plaintiff was conducting a gambling business from September 1982 to December 1983, that taxpayer failed to rebut the presumption of correctness accorded the government's tax assessments, and that the method used by the IRS to calculate the assessments was reasonable. The district court accordingly entered judgment for the United States in the amount of $1,107,417.07 plus interest. Subsequently, the district court amended its judgment to $902,469.94 in taxes and $203,403.13 in penalties, plus interest. This timely appeal followed.
 
 II.
 A.
 
 13
 Plaintiff Barkley argues that the district court improperly granted the government's motion for summary judgment. We review a district court's grant of summary judgment de novo. City Management Corp. v. United States Chem. Co., 43 F.3d 244, 250 (6th Cir.1994); Brooks v. American Broadcasting Cos., 932 F.2d 495, 500 (6th Cir.1991). Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); LaPointe v. United Autoworkers, Local 600, 8 F.3d 376, 378 (6th Cir.1993); Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir.1988). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). A factual dispute is "material" only if, under the governing law, its resolution might affect the action's outcome. Id. at 248. A factual dispute is "genuine" only if a reasonable fact finder could return a verdict for the nonmoving party. Id. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)).
 
 
 14
 The party opposing a properly supported motion for summary judgment may not rest upon the general allegations of the pleadings but must set forth specific facts showing that there is a genuine issue for trial. Liberty Lobby, 477 U.S. at 248-49. Conclusory assertions are not sufficient to allow a nonmovant to withstand a motion for summary judgment. Moore v. Philip Morris Cos., 8 F.3d 335, 343 (6th Cir.1993). In Celotex Corp., the Court explained: "Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324. The same rules of review apply where, as here, the parties have filed cross-motions for summary judgment. Action Distrib. Co. v. International Bhd. of Teamsters Local 1038, 977 F.2d 1021, 1025 (6th Cir.1992).
 
 B.
 
 15
 Section 4401 of the Internal Revenue Code imposes a two-percent tax on any wager not authorized under the law of the state in which it is accepted. 26 U.S.C. Sec. 4401(a). "Each person who is engaged in the business of accepting wagers shall be liable for ... the tax ... on all wagers placed with him." 26 U.S.C. Sec. 4401(c).[2] Because liability is premised on a finding that a person was engaged in the business of accepting wagers, the district court first addressed whether Barkley fell within this definition during the period of time at issue. It held that Barkley's guilty plea under 18 U.S.C. Sec. 1955[3] collaterally estopped him from denying liability for the period from September 1984 to March 1985.
 
 
 16
 Plaintiff argues that the district court erred in holding that he was collaterally estopped by virtue of his guilty plea. This court has held that in order to apply the collateral estoppel doctrine, four basic criteria must be met:
 
 
 17
 (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding;
 
 
 18
 (2) determination of the issue must have been necessary to the outcome of the prior proceeding;
 
 
 19
 (3) the prior proceeding must have resulted in a final judgment on the merits; and
 
 
 20
 (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.
 
 
 21
 Detroit Police Officers Ass'n v. Young, 824 F.2d 512, 515 (6th Cir.1987) (footnotes omitted).
 
 
 22
 Only where a factual finding was necessary to a finding of guilt will it be given preclusive effect in a later proceeding. United States v. Smith, 730 F.2d 1052, 1057 (6th Cir.1984). As the Eleventh Circuit noted in Palciauskas v. U.S. Immigration & Naturalization Serv., 939 F.2d 963 (11th Cir.1991), " 'Even though an issue was fully raised and litigated in a prior action, and a finding on the issue was made by the court preliminarily to rendition of judgment, the issue is not concluded by the resulting judgment unless the finding made on the issue was ... necessary to the judgment." Id. at 966 (citing 1b J. Moore, Federal Practice and Procedure Sec. 0.443[5.-1], at 781 (2d ed. 1988)).
 
 
 23
 In this case, the issue of fact that the district judge gave preclusive effect was not necessary to the outcome of the prior proceeding, and, therefore, collateral estoppel should not have been applied.[4] Liability for wagering tax under 26 U.S.C. Sec. 4401 is premised on a finding that a party accepted wagers or had a proprietary stake in the gambling operation. The Supreme Court noted in United States v. Calamaro, 354 U.S. 351 (1957): "Congress did not choose to subject all employees of gambling enterprises to the tax and reporting requirements, but was content to impose them on persons actually 'engaged in receiving wagers.' " Id. at 357. Likewise, in United States v. Magliano, 336 F.2d 817 (4th Cir.1964), the Fourth Circuit considered for purposes of determining liability whether the evidence showed that the defendant was a " 'writer,' 'banker,' or a person having a proprietary interest in the wagering operation within the meaning of" Calamaro. Id. at 820. See also United States v. Cooperstein, 221 F.Supp. 522, 525 (D.Mass.1963) (noting that a "pick-up" man who has "no proprietary interest in the enterprise and acts merely as a messenger transmitting records of wagers from the 'writer' ... to the 'banker' ... is not 'engaged in receiving wagers for or on behalf of any person' ").
 
 
 24
 It is clear, however, that criminal liability under 18 U.S.C. Sec. 1955 would extend beyond writers, bankers or those with a proprietary interest. This court has held that a person "conducts" a gambling business and is therefore criminally liable under 18 U.S.C. Sec. 1955 if "that person performs any act, duty or function which is necessary or helpful in operating the enterprise." United States v. Merrell, 701 F.2d 53, 55 (6th Cir.) (emphasis in original), cert. denied, 463 U.S. 1230 (1983). In Merrell, the defendant served coffee to bettors during gambling sessions, and after the sessions, he performed several janitorial functions. We held that Merrell's actions aided the gambling operation and therefore subjected him to criminal liability. Id. See United States v. Follin, 979 F.2d 369, 372 (5th Cir.1992) ("[T]he clear intent of Congress was to include all those who 'participate in the operation of a gambling business, regardless [of] how minor their roles.' ") (quoting United States v. Tucker, 638 F.2d 1292, 1296 (5th Cir.), cert. denied, 454 U.S. 833 (1981)), cert. denied, 113 S.Ct. 3004 (1993). In fact, in its brief, the government concedes "that a 'runner,' could be subject to criminal prosecution under 18 U.S.C. 1955 but would not be subject to wagering excise tax liability under I.R.C. Sec. 4401." Brief for Defendant at 18.
 
 
 25
 Because a finding that the defendant accepted wagers or had a proprietary interest in the gambling operation is not necessary for an imposition of criminal liability under 18 U.S.C. Sec. 1955 but is necessary for a tax assessment under 26 U.S.C. Sec. 4401, we find that plaintiff's guilty plea does not collaterally estop him from denying that he was engaged in the business of accepting wagers from September 1984 to March 1985.
 
 
 26
 Based on our finding that collateral estoppel is inappropriate in this case, we must consider whether a genuine issue of material fact exists as to plaintiff's role in the gambling operation from September 1984 to March 1985. The government supported its motion for summary judgment with, among other items, Barkley's indictment, a transcript of Barkley's guilty plea hearing, Barkley's motion for reduction of fine and memorandum in support, portions of the transcript of Barkley's April 13, 1993 deposition, portions of the transcript of Kalmus's May 25, 1993 deposition, and portions of the transcript of Stewart's May 25, 1993 deposition.
 
 
 27
 First, the indictment under which Barkley pled guilty stated that he "unlawfully, wilfully and knowingly did conduct, finance, manage, supervise, direct and own an illegal gambling business." J.A. 88. At his change of plea hearing, Barkley acknowledged that he had read the indictment and understood every allegation against him. When asked at the hearing if he participated in the illegal gambling business as charged in the indictment, Barkley responded affirmatively. Although Barkley's plea of guilty would not collaterally estop him from litigating this issue at trial, his admission that he had a proprietary interest in the gambling operation would be admissible by the government to support its attempt to prove Barkley's liability for the wagering tax and to impeach Barkley's testimony. Second, in his motion for reduction of fine that followed his sentencing, Barkley admitted that he possessed a proprietary interest in the gambling operation. He stated: "During the partnership, Merritt and Stewart were the major figures in the four-way partnership. Barkley and Burns had smaller interests (less than ten percent) in the fruits of bookmaking activities." J.A. 111.[5]
 
 
 28
 Once the government met its burden of production, plaintiff Barkley could not rest on his pleadings to get to the jury. Liberty Lobby, 477 U.S. at 248-49. Instead, he was required to produce specific facts showing that there is a genuine issue for trial. Celotex Corp., 477 U.S. at 324. Barkley supported his motion with his own affidavit, the affidavits of Merritt and Stewart,[6] and the deposition testimony of Kalmus, Stewart, and himself. First, Barkley testified at his deposition that he did not make money from the bets he collected on behalf of Merritt. Rather, he stated that he was a runner who collected on behalf of Merritt and that he loaned money to Merritt on occasion. Likewise, Merritt's affidavit states that he and Barkley did not agree "to share bets or take bets on behalf of each other, and at no time did [he] meet or discuss with Mr. Barkley a bookmaking operation." J.A. 175.
 
 
 29
 We have held that it is improper for a district court to make credibility determinations at the summary judgment stage. Adams v. Metiva, 31 F.3d 375, 382 (6th Cir.1994); Liberty Lobby, 477 U.S. at 249. Instead, it must view all the facts in the light most favorable to the nonmoving party, City Management Corp., 43 F.3d at 250, and, therefore, we must presume that Barkley's and Merritt's statements are true. Because Barkley's testimony and Merritt's affidavit describe the gambling operation in a different way than the government's evidence describes it, we find that a genuine issue of material fact exists as to Barkley's role from September 1984 to March 1985. We therefore conclude that the district court erred in deciding that Barkley was engaged in the business of accepting wagers from September 1984 to March 1985.
 
 C.
 
 30
 Plaintiff Barkley further argues that the district court's determination that he was engaged in the business of accepting wagers from September 1982 to December 1983 and therefore liable for tax under 26 U.S.C. Sec. 4401 was improper, and he asserts that defendant failed to meet its burden of proof regarding this period. The district court noted that defendant substantiated its claim that plaintiff was accepting wagers during this time period using the deposition testimony of plaintiff Barkley, Kalmus, and Stewart. The district court held that the plaintiff responded only with a general denial of accepting wagers or having a financial interest in the gambling operation during this time.
 
 
 31
 We find, however, that a genuine issue of material fact exists as to Barkley's role in the gambling operation during the time period at issue. To support its contention that Barkley was engaged in the business of accepting wagers from September 1982 to December 1983, the government cited the deposition testimony of Kalmus and Stewart. Kalmus and Stewart both testified to Barkley's involvement in gambling operations as early as September 1982. Kalmus testified that Barkley's participation was as a partner, while Stewart claimed no knowledge of his arrangement.
 
 
 32
 In contrast, Barkley testified that he had never made a profit from his participation in the gambling ring, and the admissions he made in connection with his guilty plea are not applicable to this time period. Furthermore, he denied any involvement with Kalmus. Because we must view the facts in the light most favorable to the nonmoving party and must not make credibility determinations regarding the testimony presented in considering a motion for summary judgment, we find that Barkley's testimony creates a genuine issue of material fact as to whether he was engaged in the business of accepting wagers from September 1982 to December 1983. We therefore conclude that the district court erred in granting summary judgment regarding plaintiff's role during this period of time.
 
 D.
 
 33
 Finally, plaintiff contends that the district court erred in granting the government's motion for summary judgment on the grounds that the government's tax assessment was arbitrary and unreasonable. Because we have already determined that summary judgment was improperly granted regarding Barkley's liability for taxes during the entire 24-month period, it is not necessary for us to reach this issue.
 
 III.
 
 34
 For the reasons stated, the district court's grant of summary judgment is REVERSED, and this case is REMANDED to the district court for further proceedings consistent with this opinion. However, we do not in any way suggest or imply what its eventual decision should be.
 
 
 
 [1]
 Tax assessments were made against Barkley for September, October, November, and December of 1982; all of 1983, except August; September, October, November, and December of 1984; and January, February, and March of 1985. Although this period is longer than the time covered by the indictment and guilty plea, the IRS contended that Barkley's involvement spanned this period
 
 
 [2]
 26 U.S.C. Sec. 4401 provides in relevant part:
 (a) Wagers.--
 (1) State authorized wagers.--There shall be imposed on any wager authorized under the law of the State in which accepted an excise tax equal to 0.25 percent of the amount of such wager.
 (2) Unauthorized wagers.--There shall be imposed on any wager not described in paragraph (1) an excise tax equal to 2 percent of the amount of such wager.
 * * *
 (c) Persons liable for tax.--Each person who is engaged in the business of accepting wagers shall be liable for and shall pay the tax under this subchapter on all wagers placed with him. Each person who conducts any wagering pool or lottery shall be liable for and shall pay the tax under this subchapter on all wagers placed in such pool or lottery.
 
 
 [3]
 18 U.S.C. Sec. 1955 provides in relevant part:
 (a) Whoever conducts, finances, manages, supervises, directs or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both.
 (b) As used in this section--
 (1) "illegal gambling business" means a gambling business which--
 (i) is a violation of the law of a State or political subdivision in which it is conducted;
 (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
 (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
 (2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.
 
 
 [4]
 In its order, the district court relied on O'Neill v. United States, 198 F.Supp. 367 (E.D.N.Y.1961), as holding that a taxpayer is collaterally estopped from denying that he is "a person engaged in the business of accepting wagers" under Section 4401 when the taxpayer has previously entered a plea of guilty to a violation of federal anti-gambling laws. The district court's reliance on O'Neill is misplaced. We find O'Neill to be distinguishable on the grounds that the district court in O'Neill conducted a hearing at which the defendant testified and the district judge found the defendant's testimony unworthy of belief. The court stated: "The evidence in the case clearly established that the plaintiff was engaged in the business of accepting wagers. Any doubt as to that was resolved by his plea of guilty...." Id. at 369. The O'Neill court then continued to discuss the principle of collateral estoppel. In this case, however, no hearing was conducted, and the district judge had no opportunity to make a credibility determination
 
 
 [5]
 Although defendant also purported to support its motion with the depositions of Barkley, Kalmus, and Stewart, we find them irrelevant to this issue. Kalmus testified that Barkley was involved with him in 1982 and 1983, Stewart testified that he was not aware of Barkley's precise role, and Barkley himself testified that he was not anything but a runner
 
 
 [6]
 Because the affidavits of Stewart and Barkley make no reference to the ownership interests of the parties involved, it is not necessary for us to discuss them here