**Jose VERDUGO and Horace Eugene Turner, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 20803.**

United States Court of Appeals Ninth Circuit.

May 16, 1968.

Rehearings Denied Sept. 24, 1968.

As Amended Oct. 7, 1968.

Henry O. Noffsinger, Jay R. Mayhall (argued), San Francisco, Cal., for Turner.

James R. Hagan (argued), Menlo Park, Cal., for Verdugo.

Jerrold M. Ladar (argued), Robert S. Marder, Asst. U. S. Atty., Cecil F. Poole, U. S. Atty., San Francisco, Cal., for appellee.

Before BROWNING and DUNIWAY, Circuit Judges, and BYRNE,* District Judge.

BROWNING, Circuit Judge:

Turner and Verdugo were convicted under an indictment charging that on or about July 28, 1964, in San Francisco, California, they fraudulently and knowingly sold and concealed and facilitated the sale, concealment and transportation of 2.695 grams of heroin which had been imported into the United States unlawfully, as appellants knew.

The government's evidence as to the transaction was as follows. Prior to July 28, Agent Chesley of the Federal Narcotics Bureau received information from an informer named Wilson that appellant Verdugo was dealing in narcotics. On that date Agent Chesley and Wilson went to the vicinity of 24th and Folsom streets in San Francisco, between six and seven in the evening, to meet Verdugo and to purchase narcotics from him if any were available. Wilson told Agent Chesley that they were to meet Verdugo in the Latin Circle bar on 24th Street.

When Wilson and Agent Chesley entered the bar, appellant Turner was playing a pinball machine. Wilson asked Turner if Verdugo was there. Turner said, "No. He was here, but he's gone. He will be back."

* Honorable William M. Byrne, Senior District Judge, Central District of California, sitting by designation.

Wilson and Agent Chesley then went to Glady's Cafe, which was nearby. Verdugo entered the cafe a few minutes later, walked over to Wilson and said, "I told you the other place." Wilson responded, "We were there. Where were you?" Wilson then asked Verdugo, "Can we still get the two spoons?" Verdugo replied, "Yes, at the other place in a couple of minutes," and left. Wilson and Agent Chesley waited a few minutes, then left the cafe and returned to the Latin Circle.

Turner was still at the pinball machine. Wilson asked him if Verdugo was "around." Turner replied, "No, but he will be here." Wilson and Agent Chesley sat down fifteen to twenty feet from Turner. In a few minutes Verdugo entered the bar and joined them. Wilson asked Verdugo if they could "get the two spoons." Verdugo said that Agent Chesley looked like "heat," but was assured that Agent Chesley was not a police officer. The terms of the purchase were agreed to. Agent Chesley handed Wilson $140 in official advance funds. Wilson passed the money to Verdugo. Verdugo then said to Wilson, "Go see that guy over there," indicating Turner at the pinball machine.

Wilson walked over to Turner. Turner bent down toward the floor. He then handed a tinfoil-wrapped package to Wilson.

Wilson carried the package back to Verdugo and Agent Chesley and handed it to the latter. Verdugo said to Wilson, "Hey, your cut's in there. I give you a little good taste"; and then to Agent Chesley, "Take it easy on that. That's good stuff."

Subsequent examination and analysis of the contents of the package disclosed approximately two "spoons" of heroin.

Both appellants took the stand. Turner testified that he was not in the Latin Circle bar on July 28, 1964. He testified, however, that he was frequently there around the middle of August; that he saw Wilson, alone at the bar once in August at about two o'clock in the afternoon; that Wilson asked Turner for some matches; that he, Turner, reached down and picked up some matches from a window ledge and threw them on the pinball machine; and that Wilson picked them up. Turner further testified that he had never seen Wilson and Agent Chesley together; that he had no dealings with Wilson in July 1964; that he had not seen Agent Chesley in July 1964; and that he did not recall any incident like that testified to by Agent Chesley.

Verdugo testified that Agent Chesley had arrested him on another charge in January 1964 and that in July of that year Wilson, accompanied by Agent Chesley, approached him in Glady's Cafe. Wilson asked if he had "anything," but he recognized Agent Chesley as "heat" and told Wilson that he did not know what he wanted, and to let him alone. Verdugo further testified that he was in Glady's Cafe and the Latin Circle bar practically every day during July and August, but not on July 28. On that day he was "round my house some place, playing around." He denied that the events testified to by Agent Chesley had occurred.

A brief review of the statute [1] in the light of recent decisions [2] will be useful in considering appellants' contentions.

1. The indictment was drawn under 21 U.S.C. § 174, which reads:

Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same

to have been imported or brought into the United States contrary to law, or conspires to commit any of such acts in violation of the laws of the United States, shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,000. For a second or subsequent offense (as determined under section 7237(c) of the Internal Revenue

2. See note 2 on page 603.

The first paragraph of section 174 creates an offense having the following elements: (1) participation in a transaction involving narcotic drugs in any one of the ways specified in the statute (importation, receipt, concealment, purchase, etc.); (2) commission of this physical act "fraudulently or knowingly"; (3) illegal importation of the narcotic drug; and (4) knowledge of the illegal importation.

■ The second paragraph of section 174 permits the trier of fact to infer guilt from unexplained possession of the narcotic drug by the defendant. This inference is constitutionally permissible because in common experience possession of such a substance, otherwise unexplained, is probative of the existence of all the elements of the offense, that is, there is a rational connection between the fact proved and the facts inferred. Yee Hem v. United States, 268 U.S. 178, 45 S.Ct. 470, 69 L.Ed. 904 (1925).

■ It remains the right of the trial judge to direct a verdict or enter a judgment n. o. v. when the evidence as a whole is insufficient to support a conviction as a matter of law, notwithstanding proof of possession. And although the evidence as a whole meets this minimum standard, it remains the function of the jury to determine whether that evidence, including the evidence of possession, establishes each element of the offense beyond a reasonable doubt. United States v. Gainey, 380 U.S. 63, 68–70, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965).[3]

We turn to appellants' contentions, considering first those of appellant Turner.

Turner argues that even if the government's version of the facts is accepted, he had physical possession of the narcotics for only a moment and such fleet-

Code of 1954), the offender shall be imprisoned not less than ten or more than forty years and, in addition, may be fined not more than $20,000.

Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury.

2. Particularly pertinent are our decision in Chavez v. United States, 343 F.2d 85 (1965), and the decisions of the Second Circuit in United States v. Peeples, 377 F.2d 205 (1967), and United States v. Llanes, 374 F.2d 712 (1967), interpreting the second paragraph of § 174, and the decisions of the Supreme Court in United States v. Gainey, 380 U.S. 63, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965), and United States v. Romano, 382 U.S. 136, 86 S.Ct. 279, 15 L.Ed.2d 210 (1965), interpreting other statutes providing for similar inferences.

3. An explanation of possession "to the satisfaction of the jury," as those words are used in the second paragraph of § 174, means any evidence, direct or circumstantial, which is sufficient to satisfy the jury that despite evidence of possession by the defendant the government has failed to meet its burden of proof. Such a failure of proof may occur, despite proof of possession, with respect to any one of the essential elements of the § 174 offense.

In United States v. Llanes, 374 F.2d 712, 715 (2d Cir. 1967), Judge Friendly offers examples of exculpatory evidence with respect to each of the elements of the offense except that of illegal importation. A possible basis for evidence negating this element of the offense is afforded by the provision of 21 U.S.C. § 513 authorizing importation "of any narcotic drug or drugs" for scientific purposes. Cf. Erwing v. United States, 323 F.2d 674 (9th Cir. 1963).

Llanes, as well as Chavez v. United States, 343 F.2d 85, 90 (9th Cir. 1965), and Griego v. United States, 298 F.2d 845, 848 (10th Cir. 1962), hold that testimony that the defendant did not know that the drugs found in his possession were illegally imported requires submission of the issue of knowledge of unlawful importation to the jury for determination under the standard of reasonable doubt. Cf. United States v. Christmann, 298 F.2d 651, 653 (2d Cir. 1962), which holds that the defendant's testimony that she thought the package which she illegally imported contained "essence of perfume" rather than heroin, made satisfaction of the requirement that the physical act specified in the statute be done "knowingly" an issue of fact for the jury.

ing contact is not sufficient to bring the section 174 inference into play. He contends that without the aid of the statutory inference the evidence was insufficient.

■ As we have suggested, the sufficiency of the case against Turner is not to be tested by considering the evidence relating to the duration of possession (or to any other relevant fact) in isolation, followed by an examination of the remaining evidence. The question is whether on the whole evidence, including the inferences reasonably drawn from it, the jury could reasonably conclude that all of the elements of the offense had been established beyond a reasonable doubt.

■ We think the jury could properly infer from the government's evidence, as we have briefly summarized it, that Verdugo arranged to sell Wilson two "spoons" of heroin at the Latin Circle bar on July 28, that Turner was party to these arrangements after the fact if not before, that Turner agreed to participate by holding the heroin in his possession at the planned place of delivery until the money had passed, so that it might not be found on Verdugo's person in the event of trouble, and that Turner played the part he had agreed to play. The inherent improbability of Turner's own testimony added substantial strength to these inferences.[4] Thus the evidence viewed as a whole, including Turner's possession of the drug and all the circumstances surrounding that possession, was sufficient to establish that Turner facilitated the sale and concealment of the two "spoons" of heroin, and

that he did so "knowingly"—with actual knowledge of the nature of the transaction, the substance involved, and the significance of his acts, or with "a conscious purpose to avoid enlightenment." Griego v. United States, 298 F.2d 845, 849 (10th Cir. 1962).

■ The remaining essential elements are unlawful importation and Turner's knowledge of it. Common knowledge that importation or domestic production of heroin is prohibited by law afforded a sufficient basis for the jury's determination that this heroin was in fact unlawfully imported, absent evidence that the drug was part of the miniscule supply lawfully imported or domestically manufactured. Cf. Erwing v. United States, 323 F.2d 674 (9th Cir. 1963). And the jury could also conclude that what was common knowledge to it was known to Turner, a person shown by sufficient evidence to have knowingly engaged in the clandestine sale of the subtance, absent evidence of lack of knowledge. Cf. United States v. Llanes, 374 F. 2d 712, 715–16 (2d Cir. 1967); Chavez v. United States, 343 F.2d 85, 90 (9th Cir. 1965); Griego v. United States, 298 F.2d at 848.

No constitutional problem was presented by the court's instructions permitting the jury to infer illegal importation and knowledge from Turner's possession. The jury could obviously have found that Turner was in possession and control of the heroin during the entire time covered by the government's testimony. And though the duration of Turner's possession may have been relatively brief, the circumstances surrounding it were cer-

4. Turner points out that he moved for judgment of acquittal under rule 29(a), Fed.R.Crim.P., at the close of the government's case, and contends that testimony subsequently introduced as part of his own case should not be considered in reviewing the denial of this motion, citing Frankln v. United States, 117 U.S.App.D.C. 331, 330 F.2d 205, 208 (1964), which rests upon Cephus v. United States, 117 U.S.App.D.C. 15, 324 F.2d 893 (1963). These cases hold the waiver doctrine inapplicable where the

inculpating testimony is that of a codefendant. This circuit has followed the waiver rule generally, see decisions from this and other circuits cited with approval in United States v. Calderon, 348 U.S. 160, 164 n. 1, 75 S.Ct. 186, 99 L.Ed. 202 (1954); see also Benchwick v. United States, 297 F.2d 330, 335 (9th Cir. 1961); Maulding v. United States, 257 F.2d 56, 58, 17 Alaska 592 (9th Cir. 1958). Since we do not rely upon Verdugo's testimony, we need not consider the exception suggested in *Franklin* and *Cephus*.

tainly not such that it can be said "the rational connection between defendant's 'possession' and the probability that the defendant had knowledge of the source of the drugs would be remote * * *." Hernandez v. United States, 300 F.2d 114, 123 (9th Cir. 1962). Cf. United States v. Santore, 290 F.2d 51, 79, 82 (2d Cir. 1960).

We conclude that as to Turner the evidence was sufficient to establish all of the elements of the offense.

The instruction which the trial court gave as to the function of the section 174 inference followed the form found in Mathes & Devitt, Federal Jury Practice & Instructions, § 39.08 (1965). It is commonly given. Counsel did not object to it below and has not challenged it here. Nonetheless, it seems advisable to point out that this instruction, quite understandably, no longer states the jury's functions in relation to the inference, as developed in recent decisions, as clearly as it might. Cf. United States v. Llanes, 374 F.2d 712, 716 (2d Cir. 1967); United States v. Reid, 347 F.2d 344, 345 (2d Cir. 1965). The instructions approved by the Supreme Court in United States v. Gainey, 380 U.S. 63, 69–70, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965), modified in light of the differences in the statutes involved,

furnishes a guide for an appropriate instruction on this subject.

It should also be noted that to avoid any possible Fifth Amendment problem "the better practice would be to instruct the jurors that they may draw the inference *unless the evidence in the case* provides a satisfactory explanation for the defendant's [possession of the narcotic drugs], *omitting* any explicit reference to the statute itself in the charge." 380 U.S. at 71, 85 S.Ct. at 759 n. 7 (emphasis added).

Turner also contends that the trial court committed plain error in instructing the jury on the meaning of the word "conceal," as used in the statute and indictment. We agree that the instruction was erroneous, but the defect did not affect Turner's substantial rights. Rule 30, 52(b), Federal Rules of Criminal Procedure.

The instruction, quoted in the margin,[5] opens with a succinct statement of the term's ordinary meaning: "to hide or keep from sight or view." In the present case, no more was required. But the instruction continues with the statement that as used in section 174 "conceal" has a broader meaning. A theory of constructive concealment is then presented. Its substance is that since there is an affirmative duty to keep narcotic drugs

---

5. The instruction, taken from Mathes & Devitt, Federal Jury Practice & Instructions, § 39.07 (1965), reads:
Although the verb "conceal" ordinarily means to hide or keep from sight or view, the expression as used in the statute and the indictment here carries a broader meaning. The law imposes an internal revenue tax upon all legitimate narcotic drugs and provides that revenue stamps evidencing payment of the tax "shall be so affixed to the bottle or other container as to securely seal the stopper, covering, or wrapper thereof." It is unlawful "for any person to purchase, sell, dispense, or distribute narcotic drugs except in the original stamped package or from the original stamped package; the absence of appropriate tax-paid stamps from narcotic drugs is prima facie evidence of violation of law by the person in whose possession the same may be found," unless

the person possessing the narcotic drugs has obtained them from a registered dealer, such as a pharmacist, upon prescription issued for legitimate medical uses by a physician or other registered and licensed person. Since the law imposes upon every person possessing a narcotic drug (other than upon legitimate medical prescription) *the affirmative duty* to keep the narcotic drug in a container bearing revenue stamps evidencing payment of the tax, the wilful failure of a person who is in actual or constructive possession of any untaxed narcotic drug (other than upon legitimate medical prescription) to reveal to some Internal Revenue official the existence of such narcotic drug, amounts to a concealment within the meaning of the statute, even though such narcotic drug may not actually be hidden or kept from sight or view.

in a sealed container bearing revenue stamps, failure of the possessor of untaxed drugs to reveal the drugs to the tax collector "amounts to concealment within the meaning of [section 174], even though such narcotic drugs may not actually be hidden or kept from sight or view."

None of the cases cited in Mathes & Devitt's work in support of the instruction [6] suggests this interrelationship between 21 U.S.C. § 174 (1964) and the narcotic-taxing statutes 26 U.S.C. §§ 4701–4707 (1964). We have found none that do. 26 U.S.C. § 4704(a) (1964) can be traced no farther back than the Act of February 4, 1919, 49 Stat. 1131, or perhaps, considered more generally, to the Act of December 17, 1914, 38 Stat. 785. The origins of 21 U.S.C. § 174 are found in the Act of February 9, 1909, 35 Stat. 614. When Congress made it an offense to "conceal" narcotic drugs in 1909 it could hardly have had in mind mere failure to satisfy a tax obligation which did not exist until 1919, or 1914, at the earliest.[7]

The instruction is objectionable for still another reason. It describes an offense—the sale of narcotic drugs other than in or from the original stamped package, 26 U.S.C. § 4704(a) (1964) [8]—with which appellants were not charged, and informs the jury that "the absence of appropriate tax-paid stamps from narcotic drugs is prima facie evidence of violation of law by the person in whose possession the same may be found." At best the recitation of these irrelevant statutory provisions must be both dis-

tracting and confusing to a jury. It may also prejudice the defendant in a jury's eyes by revealing the defendant's commission of another crime.[9]

In the present case, however, we think these risks were minimal. Appellants did not contend that the conduct testified to by Chesley did not constitute concealment within the meaning of the statute and the indictment. Obviously that testimony disclosed concealment in the ordinary sense, for if the transaction testified to by the witness occurred, it was undeniable that appellants had taken elaborate steps to secrete the heroin until delivery. The defense was that the events testified to by the government witness simply had not occurred at all. Thus, as the case was presented to the jury, appellants either did not have possession of the drugs at all or they concealed the drugs in the ordinary sense of that term, which was accurately stated in the instruction. There was no middle ground. The constructive possession subsequently described in the instruction was not presented as an alternative by any possible interpretation of the evidence. It therefore could not have been the basis for the verdict. United States v. Monticallos, 349 F.2d 80 (2d Cir. 1965); cf. United Brotherhood of Carpenters, etc. v. United States, 330 U.S. 395, 408–409, 67 S.Ct. 775, 91 L.Ed. 973 (1947).

■■■ We agree, of course, that "when a false issue of magnitude sufficient to nullify proper consideration of the issues is inserted into a case, the proper admin-

---

6. Hyche v. United States, 286 F.2d 248 (5th Cir. 1961); Corey v. United States, 305 F.2d 232, 236 (9th Cir. 1962); United States v. Mathies, 203 F.Supp. 797 (W.D.Pa.1962).

7. It may also be noted that cases arising under 26 U.S.C. § 7206(4) (1964) and its predecessors, making it an offense to "conceal" non-taxpaid liquor, give the term its ordinary meaning, United States v. Davis, 369 F.2d 775, 779 (4th Cir. 1966); Turner v. United States, 192 F.2d 41 (4th Cir. 1951); see also United States v. Shapiro, 113 F.2d 891, 892–893, 130 A.L.R. 147 (2d Cir. 1940).

8. 26 U.S.C. § 4704(a) provides:
   It shall be unlawful for any person to purchase, sell, dispense, or distribute narcotic drugs except in the original stamped package or from the original stamped package; and the absence of appropriate tax-paid stamps from narcotic drugs shall be prima facie evidence of a violation of this subsection by the person in whose possession the same may be found.

9. Other possibly injurious consequences of the instruction are suggested by Turner, but seem to us too remote and speculative to merit serious consideration.

istration of justice is thwarted and a conviction so based cannot stand." Michaud v. United States, 350 F.2d 131, 134 (10th Cir. 1965). But the issue raised by this instruction was not of that magnitude. It is nowhere reflected in the examination of the witnesses; it was subject to no comment by either side in closing arguments. As we have said, the contest occupied wholly different ground.

It is equally improbable that disclosure of appellant's possible violation of the taxing statutes had any material impact upon the jury, in view of the essentially technical nature of the tax offense and its derivation from the same simple transaction as the offense charged.[10]

Verdugo raises one additional issue relating to the trial. Agent Chesley testified that he had performed a "Marquis reagent" field test with the substance in the package and obtained a reaction indicating that it was a derivative of opium. Counsel for the parties stipulated that Mr. Meuron, a United States chemist "qualified as an expert witness in the field of narcotic drug analysis," if called as a witness would testify that he had examined the substance and "formed the opinion" that the substance "was heroin." Verdugo's contention is that the trial judge invaded the province of the jury by instructing that heroin is a derivative of opium and therefore "a narcotic drug as defined by law." [11]

■ We have held that "an instruction * * * which assumes an admitted or uncontroverted fact, is not reversible error." Lyons v. United States, 325 F.2d 370, 375 (9th Cir. 1963). Cf. Brown v. United States, 334 F.2d 488 (9th Cir. 1964) (Judge Duniway concurring). This is an a fortiori case. That heroin is an opium derivative was not simply uncontroverted, it is incontrovertible. Trotter v. United States, 359 F.2d 419 (2d Cir. 1966); Jordan v. United States, 345 F.2d 302, 304 (10th Cir. 1965); United States v. Pisano, 193 F.2d 355, 359–360, 31 A.L.R.2d 409 (7th Cir. 1951); cf. Rivas v. United States, 368 F.2d 703, 712 (9th Cir. 1966). The court's further instruction that an opium derivative is a "narcotic drug" is simply a statement of law, for this is the statutory definition. It was therefore proper to instruct the jury that heroin is a "narcotic drug." The only issue for the jury was whether this was what the package contained. A later instruction, read in conjunction with the instruction to which Verdugo objects, left that issue to the jury.[12]

10. This case is not like Polansky v. United States, 332 F.2d 233 (1st Cir. 1964), relied upon by Turner, in which the jury was instructed that the defendant was charged with another offense of which she had in fact been acquitted.

Turner also relies upon United States v. Harman, 323 F.2d 650, 651 (4th Cir. 1963), where the error "consisted in failing to instruct the jury as to the law applicable to the respective counts, and in instructing the jury as to an inapplicable presumption." Reversal followed upon the appellate court's conclusion that "on the whole record substantial rights of the defendant were affected." The opinion does not disclose the particular circumstances of the case. In any event, we have reached the conclusion that on the present record Turner's substantial rights were not impaired.

11. The instruction read:
The term "narcotic drug" as used in the statute just read, means "Opium

or any compound or derivative or preparation of opium."

Heroin is a derivative of morphine, and morphine and morphine hydrochloride are both products of opium. Heroin is therefore a narcotic drug as defined by law.

12. The instruction read:
You will, of course, first ascertain whether or not the substance in question is in fact a narcotic drug, as alleged; and in so doing you will consider all evidence in the case which may aid determination of that issue, including the testimony of a chemist or other witness, or a stipulation, as in this case, as to what the chemist would have testified to had one been called as a witness, either to support or dispute the allegation that the substance in question is a narcotic drug, as alleged.

Thus the trial court left to the jury the only issue of "fact" presenting a question

Verdugo was sentenced to fifteen years' imprisonment. Turner was sentenced to five years, the minimum permitted by law, to run concurrently with a sentence imposed earlier by the State of California for another narcotics offense. Verdugo asserts that this wide disparity resulted from two errors in the sentencing process.[13] Both claims of error rest upon the use by the sentencing judge of a presentence investigation report prepared by a federal probation officer. The district court ordered the presentence report made part of the record on appeal. Verdugo calls attention to the following portions of the report.

The report recites that a large quantity of heroin and a substantial sum of money were seized in Verdugo's residence on October 1, 1964, and that the money included official advance funds paid "to five different defendants who were alleged to be trafficking in heroin for defendant Verdugo." As noted later, prior to trial the heroin referred to was suppressed as evidence and the money was ordered returned to Verdugo on the ground their seizure violated Verdugo's Fourth Amendment rights, and this reference to the suppressed evidence in the report is the basis for Verdugo's second claim of error.

The report continues, "It was alleged that for many months prior to his arrest, defendant was the major source of narcotics in the Mission District of San Francisco, having as high as 15 to 20 people dealing in heroin for him at one time." It states later, "though defendant has apparently never used narcotics, he is reputed to be one of the major sources of heroin in the Mission District of San Francisco and is alleged to have built up a large organization distributing heroin for him"; and further, "There appears to be no question whatsoever regarding defendant's activities as a supplier of narcotics to a large number of people and no question that these activities were conducted purely on a profit motivated basis."

Verdugo "is reported to always carry large sums of money on his person," and it is noted that when found guilty he gave a "large sum" to his attorney in the courtroom for delivery to Mrs. Verdugo. Verdugo's "continual possession of large sums of money" is said to be "rather significant" in view of Verdugo's "long periods of unemployment."

The report twice states that Verdugo "allegedly" hired Turner as his "gunman." It is said that Verdugo threatened the life of the arresting officer and the undercover agent at the time of his arrest. From this premise it is concluded that Verdugo presents "a real physical danger to certain individuals whom he has already threatened. It is felt defendant is perfectly willing to carry out these threats and capable of doing so."

The report concludes, "Though he would possibly not profit personally, it is felt society would be best protected if defendant would incur a substantial term of incarceration, in excess of the minimum five year sentence required."

The government does not dispute Verdugo's suggestion that the highly adverse recitations in the presentence report may have been of crucial significance in determining his sentence within the broad statutory range.[14]

of credibility for the jury. Brown v. United States, 334 F.2d 488, 500–501 (9th Cir. 1964) (Judge Duniway concurring).

13. Verdugo's further contention that the difference in the two sentences "is 'so unjustifiable as to be violative of due process'" (Schneider v. Rusk, 377 U.S. 163, 168, 84 S.Ct. 1187, 1190, 12 L.Ed.2d 218 (1964)) does not warrant separate discussion.

14. The impact of the presentence report is not limited to its effect upon the sentence. Following sentencing the report accompanies the prisoner to the institution where its contents are used "(2) to assist Bureau of Prisons institutions in their classification and treatment programs and also in their release planning, (3) to furnish the Board of Parole with information pertinent to its consideration of parole, (4) to aid the probation officer in his rehabilitative efforts during probation and parole supervision, and (5) to serve as a source of pertinent information for systematic research" (footnote

Verdugo's first claim of error is that the presentence report was not made available to him and to his counsel before sentence was imposed. He contends that his right "to make a statement in his own behalf and to present any information in mitigation of punishment" (Rule 32(a), Fed.R.Crim.P.) was of little value without knowledge of the allegations in the presentence report; and that his right to the effective aid of counsel at sentencing [15] was equally empty since counsel's ignorance of these allegations precluded him from dealing with them directly and specifically. He argues that it is impossible to defend the fairness of a sentencing procedure in which allegations of the determinative facts were immunized from explanation, correction, or refutation by deliberate nondisclosure.

The appellant's argument has force; and the authorities provide no ready answer.[16] However, since the entire presentence report is now part of the record and, for reasons which follow, we have concluded that Verdugo must be resentenced,[17] we need not decide whether in the circumstances of this case the critical factual allegations of the presentence report should have been disclosed to Verdugo or his counsel before sentence was imposed.

Verdugo's second claim of error relating to the presentence report is that the inclusion in the report and consideration by the sentencing judge of information obtained from his home by unconstitutional search and seizure violated his rights under both the Fourth and Fifth Amendments. The relevant facts are as follows.

A complaint charging Verdugo with the July 28, 1964, transaction involving 2.695 grams (.0961 ounces) of heroin was filed with the United States Commissioner on September 30, 1964. A Commissioner's warrant for Verdugo's arrest was issued the same day. Government agents arrested Verdugo and searched his residence the following day, seizing 371.465 grams (13.11 ounces) of heroin and $7,583 in currency.

A two-count indictment was returned November 18, 1964. The first count rested upon the July 28 transaction; the second count, charging Verdugo alone, on concealment of the 371.465 grams of heroin seized on October 1.

Verdugo filed a motion for suppression of the 371.465 grams of heroin and the $7,583 as evidence, and for return of the money. The district court, after an evidentiary hearing, found that the search and seizure violated Verdugo's Fourth Amendment rights and granted the motion. United States v. Verdugo, 240 F. Supp. 497 (N.D.Calif.1965).

The district court found that the officers went to Verdugo's residence "to look for the contraband and to make an arrest in order to get the same." 240 F.Supp. at 498. The court rejected the officers' testimony that they were "invited" into the home by Verdugo's wife, and found that they "intruded themselves without her consent." The court

---

omitted). Administrative Office of the U.S. Courts, Pub.No. 103, The Presentence Investigation Report 1 (1965); Chappel, Federal Parole, 37 F.R.D. 207, 210–211 (1964); Parsons, Aids in Sentencing, 35 F.R.D. 423, 429 (1964).

15. Mempa v. Rhay, 389 U.S. 128, 134, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967); Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948); Roeth v. United States, 380 F.2d 755, 756 (5th Cir. 1967); Leach v. United States, 118 U.S.App.D.C. 197, 199, 334 F.2d 945, 947 (D.C.Cir. 1964).

Subsequent to Verdugo's sentencing, Rule 32(a) was amended by adding a pro-

vision, among others, that counsel shall be given an opportunity "to speak on behalf of the defendant."

16. We reserved the question of right to access to the presentence report in Pearce v. United States, 262 F.2d 662, 664 (9th Cir. 1958).

17. It is also unnecessary to consider whether Verdugo's claim should be rejected because his counsel failed to request the trial judge to disclose the report after having been refused access to the report by the probation officer. Cf. Roeth v. United States, 380 F.2d 755, 757 (5th Cir. 1967).

pointed out that Verdugo was absent when the officers arrived. The officers made a preliminary search before stationing themselves in Verdugo's home to await his return. They refused to permit Mrs. Verdugo to leave or to use the telephone. When Verdugo arrived he was arrested without being told of the charge. He was handcuffed to a chair to restrain his movements, and the search continued for two and a half hours thereafter. Both Mr. and Mrs. Verdugo were then taken to jail, although it does not appear that there was a warrant for Mrs. Verdugo's arrest. The search continued for about two more hours after the Verdugos were taken away. Five to seven officers ransacked the Verdugo home, searching drawers, cabinets, and luggage, overturning furniture, removing covers from all of the house light switches, and punching holes in the wallboard. 240 F.Supp. at 499–500. Visitors to the Verdugo home while the search was in progress were "herded together and subjected to the strict police control of the premises." Id. at 501. "In truth," the court concluded, "the Verdugo home was converted into a police sub-station and was not the sanctuary which the Fourth Amendment commands it shall remain." Id. at 501 (footnote omitted).

The court also noted that the officers had no search warrant, although "Verdugo's activities had been the subject of investigation for at least two months before the federal agents chose to stage this siege of his home, admittedly in search of 'stash.'" There was ample time to obtain a search warrant. No emergency existed and no explanation or excuse is offered by the government for proceeding without a warrant." Id. at 500.

After entry of the suppression order, the second count of the indictment was dismissed on the government's motion.

In Armpriester v. United States, 256 F.2d 294 (4th Cir. 1958), a government witness at presentence hearing testified that after his arrest Armpriester had made a statement admitting guilt. The statement was obtained during a period of detention violative of Rule 5(a), Federal Rules of Criminal Procedure, and therefore would have been inadmissible in a trial on the issue of guilt. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). Judge Sobeloff, speaking for the court, made it unmistakably clear that if prejudice appeared,[18] resentencing would be required: "It is recognized that a court has wider latitude of inquiry in fixing the sentence than during a contest to decide an issue of guilt. [citations] Nevertheless, we would not condone the use of evidence obtained in breach of the law, even for the limited purposes of determining the sentence. The rationale of the Mallory case is that judicial proceedings shall stand or fall independently of evidence obtained in violation of Rule 5(a)." 256 F.2d at 297.

Ours would seem an a fortiori case, for the evidence considered in sentencing Verdugo was obtained in violation of a constitutional prohibition, not merely a rule of procedure. Moreover, the exclusionary rule with which we are concerned is a part of the constitutional right, not merely a rule of evidence adopted in the exercise of a supervisory

18. The court found no possibility that reference to the statement could have influenced the sentence since the content of the statement was adduced independently. 256 F.2d at 297. We cannot avoid the question of the propriety of considering this evidence in sentencing Verdugo on this ground. It appeared from the evidence at trial that Verdugo played the primary role in the July 28 transaction. The presentence reports reflected other differences between the two men, some favorable to Turner, others to Verdugo. However, the marked difference between the two was that Verdugo was said to be a large scale dealer in narcotics for profit. Aside from rumors, which the presentence report properly labeled as such, the basic support for this charge was the discovery of the wholesale quantity of heroin and the official funds disbursed in four other narcotics buys in the October 1 search of Verdugo's premises.

power. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

*Mapp* firmly established the doctrine that the exclusionary rule is part of the constitutional right to be free of unreasonable search and seizure. The precise basis for the doctrine is less clear, and the ground which ultimately prevails may, in some circumstances, affect the propriety of use of illegally seized evidence in sentencing. We are satisfied, however, that exclusion is required in this case upon any of the possible grounds for the rule.

The primary and least rigid basis for the exclusionary rule is that exclusion is required to deter the police from illegal searches and seizures.

In Linkletter v. Walker, 381 U.S. 618, 636–637, 85 S.Ct. 1731, 1741, 14 L.Ed.2d 601 (1965), the Court stated: "*Mapp* had as its prime purpose the enforcement of the Fourth Amendment through the inclusion of the exclusionary rule within its rights. This, it was found, was the only effective deterrent to lawless police action. Indeed, all of the cases since *Wolf* requiring the exclusion of illegal evidence have been based on the necessity for an effective deterrent to illegal police action." Thus *Mapp* may be read as saying only "that the Fourth Amendment, reasonably construed, allows the Court to apply the exclusionary rule if it is deemed necessary to ensure compliance with the provisions of the amendment." Landynski, Search and Seizure and the Supreme Court 78 (1966). So read, *Mapp*, may

permit relaxation of the exclusionary rule when its enforcement would have no deterrent effect or the deterrent effect would be insubstantial. Cf. Terry v. State of Ohio, 392 U.S. 1, 13–16, 88 S.Ct. 1868, 1875–1877, 20 L.Ed.2d 889 (1968).

Assuming this, we would nonetheless conclude that exclusion was required in the circumstances of the present case.

There is undoubtedly a strong public interest in the imposition of a proper sentence—one based upon an accurate evaluation of the particular offender and designed to aid in his personal rehabilitation. The permissible scope of the sentencing judge's inquiry is accordingly broad, and limitations are not lightly imposed either upon the kind of information the court may consider or the source from which it may be obtained.[19]

But the use of illegally seized evidence at sentencing cannot always be justified by this simple generality. It cannot be supposed, for example, that the court could properly consider evidence illegally seized after conviction from the accused's home by narcotics agents or by the probation officer in a zealous but misguided effort to furnish the court with full information for sentencing.[20] Moreover, whenever it is held that the deterrent value of the exclusionary rule justifies the release of a guilty man, courts necessarily also surrender the opportunity of imposing sentence upon him—the loss of this opportunity is not regarded as too great a price for insuring observance of

19. Williams v. People of State of New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L. Ed. 1337 (1949); Davis v. United States, 376 F.2d 535, 538 (5th Cir. 1967); Beufve v. United States, 374 F.2d 123 (5th Cir. 1967); United States v. Doyle, 348 F.2d 715, 721 (2d Cir. 1965); United States v. Magliano, 336 F.2d 817, 822 (4th Cir. 1964); Application of Hodge, 262 F.2d 778, 782 (9th Cir. 1958); Taylor v. United States, 179 F.2d 640, 642–643 (9th Cir. 1950); Cf. Marano v. United States, 374 F.2d 583, 585 (1st Cir. 1967); Armpriester v. United States, 256 F.2d 294, 297 (4th Cir. 1958).

20. The holding of Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.

Ed.2d 930 (1967), that the Fourth Amendment must be complied with in municipal fire, health, and housing inspection programs seems inconsistent with the suggestion (Hincks, In Opposition to Rule 34(c) (2), Proposed Federal Rules of Criminal Procedure, 8 Fed.Prob., Oct.-Dec. 3.7 (1944)) that constitutional limitations are inapplicable at the sentencing stage because sentencing is essentially an effort to deal with a "social problem." See also Martin v. United States, 183 F. 2d 436, 439 (4th Cir. 1950), holding that the Fourth Amendment protection against unreasonable searches extends to the home of a probationer.

Fourth Amendment restraints by law enforcement officers.

The incentive for illegal searches which would be created if use of the illegally seized evidence were permitted in the circumstances of this case is all too clear. The record reveals that the July 28 transaction occurred in the course of an enforcement program by agents of the Bureau of Narcotics in a particular area of San Francisco, extending over a period of several months. Agent Chesley himself participated in some ninety "buys" during a ten-week period. When the decision to search Verdugo's home was made, the agents already had in their possession sufficient evidence to convict Verdugo of the July 28 transaction. They were not seeking additional evidence for that purpose. They hoped to locate a wholesale supply of heroin. As the district court found, the agents went to Verdugo's home "to look for the contraband and to make an arrest to get the same."

The incentive for the search was strong. The range of possible penalty was wide—five to twenty years. The length of Verdugo's sentence would be quite different if it could be shown that Verdugo was involved in the narcotics traffic on a large scale rather than merely as the seller in a single small transaction.

\If the fruits of the search could be used to enhance the sentence, the possibility that the evidence might be excluded at trial would be of little importance in view of the untainted evidence avail-able to establish the July 28 offense. Unless the evidence were unavailable for sentence as well as conviction, the agents had nothing to lose by risking an unlawful search: if the motion to suppress were denied, Verdugo could be convicted of an additional offense; if it were granted, the sentence on the original charge could still be enhanced.[21]

It might be suggested that police officers are unlikely to be concerned with the sentence ultimately imposed, and, therefore, that excluding evidence at the sentencing stage cannot serve as a substantial deterrent. But this cannot be said, even now, of "the highly specialized unit which deals with specific kinds of offenses, such as those associated with narcotics, which are very serious in nature, where the investigation task is difficult, and where offenders are likely to be recidivists.\ Here, there may, indeed, be a specific police objective of lengthy incarceration, since the specialized unit may consider premature release of the offender back into the community as making more difficult their job." Ohlin & Remington, Sentencing Structure: Its Effect upon Systems for the Administration of Criminal Justice, 23 Law & Contemporary Problems, 494, 501 (1958).[22] And even if it were true that there is now no general consciousness of the potential utility of illegally seized evidence to enhance sentence, we could not ignore the fact that announcement of an exception to the exclusionary rule would inevitably produce it.[23]

---

21. Quite different considerations would apply if the object of the search were to obtain evidence to support a single charge on which the defendant was later convicted. If the additional evidence was necessary to obtain *any* conviction at all, the danger of exclusion at trial would afford a substantial deterrent to an illegal search. If the additional evidence was *not* required for conviction, both the deterrent effect of the exclusion of illegally seized evidence of the same offense at sentencing and the incentive to conduct legal searches to obtain such evidence would appear to be minimal.

22. See Caplan, Book Review, 80 Harv.L. Rev. 484, 488 (1966); Tiffany, McIntyre & Rotenberg, Detection of Crime 137–138 (1967).

23. Cf. Allen, Federalism and the Fourth Amendment: A Requiem for Wolf, The Supreme Court Review 1, 36 (1961):
Some states sought to avoid the heavy costs involved in complete acceptance or rejection of the exclusionary rule by holding the rule applicable only to certain categories of offenses. The consequences were predictable. The police, being of a pragmatic turn, tended to interpret the withdrawal of the rule in

■ We conclude that where, as here, the use of illegally seized evidence at sentencing would provide a substantial incentive for unconstitutional searches and seizures, that evidence should be disregarded by the sentencing judge. Verdugo must therefore be resentenced without consideration of such evidence.[24]

As to Turner the judgment is affirmed; as to Verdugo the case is remanded for resentence.

DUNIWAY, Circuit Judge (concurring):

I concur in the decision and in the opinion written for the court by Judge Browning. I express no opinion on any of the issues discussed in Judge Browning's separate opinion for the reason that, as his opinion for the court indicates, it is unnecessary to do so in this case.

BROWNING, Circuit Judge (separate opinion):

Some additional comment seems to me appropriate on two of the subjects dealt with in the majority opinion.

I

Although it is unnecessary to decide in this case whether it would be reversible error to deny defendant's counsel access to factual assertions in a presentence report upon which the sentence was based, it should now be said that due process may require some form of disclosure of the presentence report to the defense.

In Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948), the Court held that a sentence based upon an "extensively and materially false" factual foundation "which the prisoner had no opportunity to correct by the services which counsel would provide * * * renders the proceedings lacking in due process." 334 U.S. at 741, 68 S.Ct. at 1255. Since counsel is powerless to correct errors of which he is unaware, nondisclosure would appear to be equivalent, in practical effect, to lack of counsel. It would seem anomalous to hold that although a sentence based upon erroneous information which counsel could correct violates due process, counsel need not be given access to that information.[1]

---

given offense categories as a license to proceed in those areas without legal restraint. [Footnotes omitted.]

24. We need not decide whether the doctrine of waiver or estoppel applied in Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), is applicable at sentencing. The illegally seized evidence was not offered solely in rebuttal of an initial contrary factual showing by Verdugo, as is sometimes made by a defendant at sentencing, for example in support of a plea for probation. Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925); Lee v. United States, 368 F.2d 834 (D.C.Cir. 1966); Inge v. United States, 123 U.S.App.D.C. 6, 356 F.2d 345, 349-50 (1966); White v. United States, 121 U.S.App.D.C. 287, 349 F.2d 965 (1965); Johnson v. United States, 120 U.S.App.D.C. 69, 344 F.2d 163 (1964); United States v. Beno, 324 F.2d 582, 588 (2d Cir. 1963).

1. United States v. Maroney, 355 F.2d 302, 310 n. 10 (3d Cir. 1966); Smith v. United States, 223 F.2d 750, 754 (5th Cir. 1955), rev'd on other grounds 360 U.S. 1, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1958);

8 Moore, Federal Practice ¶ 32.03 (1968). Cf. Marano v. United States, 374 F.2d 583, 585 n. 3 (1st Cir. 1967) [but see United States v. White, 382 F.2d 445, 449-450 (7th Cir. 1967)].

The Court held in Williams v. People of State of New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), that the sentencing judge is not confined to consideration of only such evidence as would be admissible in determining guilt, and that the defendant is not entitled to confront and cross-examine the source of the court's information. But the trial court had disclosed the facts upon which the sentence was based (337 U.S. at 244, 69 S.Ct. 1079), and the consequences of a refusal to disclose were therefore not presented, as the Court specifically noted in Williams v. State of Oklahoma, 358 U.S. 576, 584, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959); and Specht v. Patterson, 386 U.S. 605, 606, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967). See Rubin, Sentences Must Be Rationally Explained, 42 F.R.D. 203, 215-216 (1967); Higgins, Confidentiality of Presentence Reports, 28 Albany L.Rev. 12, 19-20 (1964); Note, 58 Colum.L.Rev. 702, 712-13 (1958). As the two author-

The Advisory Committee on Sentencing and Review of the American Bar Association Project on Minimum Standards for Criminal Justice reached the same conclusion from similar premises underlying Kent v. United States, 383 U.S. 541, 562, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), which involved disclosure to a child's attorney of the contents of a "Special Service" file which would be available to a juvenile court judge in determining whether to waive jurisdiction and remit the child to the district court for criminal prosecution.[2] The committee stated, "the language of the *Kent* opinion strongly supports the conclusion that disclosure was necessary in order to provide the effective assistance of counsel to which the child was entitled at the waiver hearing. No less is a defendant at sentencing entitled to the assistance of counsel, and no less should that assistance be provided in a context where it can be effective. Sentencing on the basis of undisclosed factual information is inconsistent with this objective." ABA Institute of Judicial Administration, Sentencing Alternatives and Procedures 223 (Tent.Draft 1967).[3]

Disclosure would serve other important affirmative purposes, in addition to protecting the defendant's constitutional rights. Convicted persons, the courts and other agencies concerned with their proper handling,[4] and society as a whole, have the strongest interest in assuring the completeness and accuracy of presentence reports. "Despite the competency and high ideals of the probation service, which no one challenges, erroneous information can and does find its way into the reports. As Judge George L. Hart, Jr., has said in an address to the District of Columbia Sentencing Institute, 'We all recognize that errors may creep into presentence reports and that these errors may be relied on by the judge in determining sentence.'" Higgins, Confidentiality of Presentence Reports, 28 Albany L.Rev. 12, 27 (1964) (footnotes omitted).[5] "As a practical

ed articles note, several courts have misread the *Williams* opinion in this respect. See, e. g., Powers v. United States, 325 F.2d 666, 667 (1st Cir. 1963); Hoover v. United States, 268 F.2d 787, 790 (10th Cir. 1959); Friedman v. United States, 200 F.2d 690, 697 (8th Cir. 1952). Cf. United States v. Fischer, 381 F.2d 509, 511 (2d Cir. 1967). See ABA Institute of Judicial Administration, Sentencing Alternatives and Procedures 224 (Tent. Draft 1967).

In Hill v. United States, 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962), the Court held that failure to ask a defendant represented by counsel if he had anything to say before sentencing was not a jurisdictional or constitutional error cognizable on collateral attack. The Court was careful to note, however, that it was not suggested "that in imposing sentence the District Judge was either misinformed or uninformed as to any relevant circumstances." 368 U.S. at 429, 82 S.Ct. at 472. And plainly it does not follow that, because defendant's right to make a personal statement at the time he is sentenced is not constitutional in source, due process does not require that he have an opportunity to contest—and implicitly to know—the factual allegations on which his sentence is based. But cf. United

States v. Fischer, 381 F.2d 509, 511 (2d Cir. 1967).

2. It should be noted, however, that the Court expressly confined its holding to cases arising under the District of Columbia Juvenile Court Act. 383 U.S. at 556, 86 S.Ct. 1045.

3. See also United States v. Myers, 374 F. 2d 707 (3d Cir. 1967); Kadish, Legal Norm and Discretion in the Police and Sentencing Process, 75 Harv.L.Rev. 904, 917 (1962); Pye, The Administration of Criminal Justice, 66 Colum.L.Rev. 286, 296 (1966). The President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Courts 20 (1967), states: "A serious obstacle to the full participation by defense counsel in the sentencing process is that in many jurisdictions he does not have access to the presentence report."

4. See note 14, majority opinion.

5. The quoted source continues, "A survey of seventeen defense attorneys in the District of Columbia disclosed, *inter alia*, that serious mistakes often appear in these reports. Two lawyers cited cases in which the offender's sentence was in part based on an alleged criminal record when, in fact, the offender had no such

matter," such errors may be detected and corrected "only by some provision for disclosure or partial disclosure of the report to the defense." 8 Moore, Federal Practice ¶ 32.03[3], at 32–17 (1968).

For the reasons summarized here, and others, the ABA Advisory Committee on Sentencing and Review unanimously adopted the following standard: "Fundamental fairness to the defendant requires that the substance of all derogatory information which adversely affects his interests and which has not otherwise been disclosed in open court should be called to the attention of the defendant, his attorney, and others who are acting on his behalf." Id. at 213. All but one member of the committee further agreed that "[T]he simplest and fairest method of implementing this principle is to permit the parties to inspect the report." Id. at 219. The committee concluded: "This principle should be implemented by requiring that the sentencing court permit the defendant's attorney, or the defendant himself if he has no attorney, to inspect the report. The prosecution should also be shown the report if it is shown to the defense. In extraordinary cases, the court should be permitted to except from disclosure parts of the report which are not relevant to a proper sentence, diagnostic opinion which might seriously disrupt a program of rehabilitation, or sources of information which has been obtained on a promise of confidentiality. In all cases where parts of the report are not disclosed under such authority, the court should be required to state for the record the reasons for its action and to inform the defendant and his attorney

that information has not been disclosed. The action of the court in excepting information from disclosure should be subject to appellate review." Id. at 213–14. The same general conclusion was reached by The President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Courts 20–21 (1967). Granted a power in the sentencing judge to withhold information in exceptional cases, no policy would appear to be served by a blanket rule permitting nondisclosure in *all* cases.

It is true that recently amended Rule 32(a), Federal Rules of Criminal Procedure, permits rather than requires the sentencing court to disclose all or part of the material contained in the presentence report to defendant or his counsel. 383 U.S. 1108 (1966). The amendment, however, was clearly intended to encourage disclosure. As the Advisory Committee stated, "It is hoped that courts will make increasing use of their discretion to disclose so that defendants generally may be given full opportunity to rebut or explain facts in presentence reports which will be material factors in determining sentences." Advisory Committee Note to Proposed Rule 32(c) (2), Federal Rules of Criminal Procedure, 39 F.R.D. 193, 194 (1966).[6]

The grant of discretion "contemplates a deliberate judgment in the circumstances of the particular case * * *." Barron & Holtzoff, Federal Practice & Procedure 143 (1967 Supp.). It does not follow from the existence of discretion that denial of disclosure may not be reversible error, without regard to the contents of the report and its impact upon the accused. Williams v.

---

record. Another counsel cited a case where an unusually severe sentence was imposed for a robbery conviction. Three post-sentencing motions for the reduction of sentence were denied and then, inexplicably, probation was granted. Others of the defense counsel surveyed cited erroneous statements made by judges on the basis of faulty reports." See also examples and authorities cited, ABA Institute of Judicial Administration, Sentencing Alternatives and Procedures 218–19

(Tent.Draft 1967). In Townsend v. Burke, The Supreme Court also alluded to the danger—which could be irremediable without disclosure—that the sentencing judge himself could seriously misconstrue the facts on which the sentence was based. 334 U.S. at 740, 68 S.Ct. 1252.

6. See also United States v. Fischer, 381 F.2d 509, 512 (2d Cir. 1967) ; Bannister v. United States, 379 F.2d 750, 753–754 (5th Cir. 1967).

People of State of New York, 337 U.S. at 252, n. 18, 69 S.Ct. 1079; Marano v. United States, 374 F.2d 583, 585, n. 3, 586 (1st Cir. 1967).

Moreover, as Justice Black has said, it is "reasonably certain" that the Court's transmittal of the Amended Rules to Congress "does not carry with it a decision that the amended rules are all constitutional." 383 U.S. 1032 (1966). Recent history makes this clear.[7]

## II

As the majority opinion states, the deterrence rationale of the exclusionary rule required the court to refrain from considering the illegally seized evidence in sentencing Verdugo. It should be noted that this result would be compelled by other considerations underlying the exclusionary rule, even if it were not clearly required for the purpose of deterring illegal searches.

Language in *Mapp* and earlier cases cited in that opinion (particularly Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914)), indicates that the exclusionary rule is part of the constitutional right because subsequent use of illegally seized evidence constitutes, in itself, a further violation of the victim's right of privacy, which cannot be regarded as encompassing only the right to be free of the initial unlawful intrusion. 367 U.S. at 647, 648, 655–656, 81 S.Ct. 1684. In Justice Holmes' words, "If the search and seizure are unlawful as invading personal rights secured by

the Constitution those rights would be infringed yet further if the evidence were allowed to be used." Dodge v. United States, 272 U.S. 530, 532, 47 S.Ct. 191, 192, 71 L.Ed. 392 (1926).[8]

The exclusionary rule has also been traced to the intent of the Framers, for "Surely those who drafted the constitutional provisions did not anticipate that the community should be permitted to reap an advantage that could be secured only by violating them." Allen, Federalism and the Fourth Amendment, The Supreme Court Review 34 (1961).[9] This rationale, too, would require the unyielding rejection of illegally seized evidence without regard to deterrent effect.

*Mapp* suggests that the exclusionary rule rests upon the privilege against compelled self-incrimination. 367 U.S. at 646, 647, 656, 81 S.Ct. 1684; see also 367 U.S. at 661–666, 81 S.Ct. 1684 (Black, J., concurring).[10] On this premise, exclusion without regard to deterrent effect would seem required whenever, as in this case, the unlawfully seized evidence inculpates the accused in an offense other than that for which he stands convicted.[11] If the court were free to consider the suppressed evidence for the purpose of sentencing, suppression for the purpose of trial might be worse than useless to the accused, serving only to deny him the benefit of a trial for the separate offense.

This is illustrated by the record in the present case, for Verdugo was sentenced as if he had been convicted of the

---

7. See, e. g., 1966 Amendments to Rule 44, Federal Rules of Criminal Procedure, necessitated by intervening Supreme Court decisions. 8 Moore, Federal Practice ¶ 44.01–44.02, at 44–2–44–7 (1968).

8. See also Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); Cunningham v. Heinze, 352 F.2d 1, 4 (9th Cir. 1965); Cipres v. United States, 343 F.2d 95, 98 (9th Cir. 1965). Cf. Burgett v. State of Texas, 389 U.S. 109, 114–115, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967).

9. Cf. People v. Cahan, 44 Cal.2d 434, 282 P.2d 905, 914 n. 9, 50 A.L.R.2d 513 (1955); Traynor, Mapp v. Ohio at Large

in the Fifty States, 1962 Duke L.J. 319; Schwartz, Excluding Evidence Illegally Obtained: American Idiosyncracy and Rational Response to Social Conditions, 29 Modern L.Rev. 635, 636 (1966).

10. See also One 1958 Plymouth Sedan v. Com. of Pennsylvania, 380 U.S. 693, 703–705, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965) (Justice Black concurring); Ker v. State of California, 374 U.S. 23, 30, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

11. Arguably, a different result could be reached if the offense involved were the same. But cf. Thomas v. United States, 368 F.2d 941 (5th Cir. 1966).

count in the indictment which rested upon the suppressed evidence, and which had therefore been dismissed.[12]

It is no answer to this Fifth Amendment argument to say that sentencing, unlike trial, is concerned with rehabilitation of the accused, rather than with guilt. Whatever hope we may have for the future, retribution persists as an accepted element of sentencing as we now know it.[13]

Exclusion is also indicated, without reference to deterrence, for the preservation "of judicial integrity," a rationale mentioned in *Mapp* (367 U.S. at 659, 81 S.Ct. 1684), and emphasized in other cases.[14] This reasoning postulates that use by the court of illegally seized evidence would make the court party to the offense against the Constitution. It is difficult to see how judicial use of such material for sentencing would be any less lawless than judicial use to obtain a conviction.

BYRNE, District Judge (dissenting in part):

There is no disagreement among the members of the panel as to the propriety of affirming the convictions of both Turner and Verdugo. The majority have, however, determined that the case as to Verdugo should be remanded to the District Court for resentencing. From this determination I respectfully dissent.

Two grounds of error are raised by Verdugo with respect to the alleged defects in the sentencing procedure. He first argues that he was improperly sentenced because of the failure of the trial

12. When Verdugo was sentenced, the following proceedings occurred:

> THE COURT: Remanded to custody of the Attorney General or his authorized representative for the term of 15 years on the first count, 15 years on the second count, the sentence is to run concurrently with each other.
> U.S. ATTORNEY: It is my impression that there was only one count outstanding.
> THE COURT: Did we only go to trial on one count?
> U.S. ATTORNEY: Yes, Your Honor. I think the defendant should be recalled.
> THE COURT: Mr. Murphy? [Verdugo's counsel]
> MR. MURPHY: Yes, Your Honor?
> THE COURT: The original indictment shows two counts.
> The original indictment in this case was framed in two counts in which the defendant was named in both counts. At the time of sentencing, the Court inadvertently based sentence on the two counts rather than the single first count of which the defendant was convicted by the jury, so the sentence is corrected at this time to show imposition of a single sentence of 15 years on the first count, the offense of which the defendant was convicted by the jury at the time of trial.
> MR. MURPHY: Do you understand that, Mr. Verdugo? Only one count?
> THE DEFENDANT: Yes.
> U.S. ATTORNEY: May the record show the second count was dismissed prior to trial?

13. "Retribution or social retaliation, though persistently criticized by modern advocates of a progressive penology, continues to be a major ingredient of our penal law and of our correctional system." Tappan, Crime, Justice and Correction 241 (1960). See also The President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Corrections 2 (1967); ABA Institute of Judicial Administration, Sentencing Alternatives and Procedures 62 (Tent.Draft 1967).

14. See, e. g., Elkins v. United States, 364 U.S. 206, 223, 80 S.Ct. 1437, 4 L.Ed. 2d 1669 (1960); Weeks v. United States, 232 U.S. 383, 391, 394, 34 S.Ct. 341 (1914). As Justice Stewart stated in Harrison v. United States, 392 U.S. 219, 224, n. 10, 88 S.Ct. 2008, 2011, 20 L.Ed. 2d 1047 (1968): "But it is not deterrence alone that warrants the exclusion of evidence illegally obtained—it is 'the imperative of judicial integrity.' [Elkins v. United States, 364 U.S. 206, at 222, 80 S.Ct. 1437.] The exclusion of an illegally procured confession and of any testimony obtained in its wake deprives the Government of nothing to which it has any lawful claim and creates no impediment to legitimate methods of investigating and prosecuting crime. On the contrary, the exclusion of evidence causally linked to the Government's illegal activity no more than restores the situation that would have prevailed if the Government had itself obeyed the law." See also Lee v. State of Florida, 392 U.S. 378, 384–386, 88 S.Ct. 2096, 2100–2101, 20 L.Ed. 2d 1166 (1968).

judge to provide him with a copy of the presentence report prior to the time of sentencing. The second point raised by Verdugo is that the presentence report contained information obtained by means of an illegal search and seizure, and the consideration of this material by the judge violated his rights under the Fourth and Fifth Amendments.

In response to the appellant's first claim of error, the majority concludes that it is not necessary to decide the question in this case, because Verdugo must be resentenced in any event for the reasons urged in support of the second ground of error.[1] Since I do not agree that Verdugo must be resentenced for the reasons urged in support of the second ground of error, I must also state my views as to why there is no merit to the first alleged ground of error.

The question whether the defendant should be accorded the opportunity to see and refute allegations made in presentence reports has been the subject of heated controversy.[2] These discussions resulted in the 1966 Amendment to Rule 32 of the Rules of Criminal Procedure, which provides the sentencing court *may* disclose to the defendant or his counsel all or part of the material contained in the presentence report.

The 1966 Amendment to Rule 32 codified the case law. In the vast majority of cases which have considered this problem it has been held that there is no requirement in the Constitution or otherwise that the sentencing judge reveal this information to the defendant or his attorney.

If I were participating in a seminar for newly appointed judges and if I were asked my views, I would suggest that, as a matter of policy, a district judge, in the exercise of his discretion, make a copy of the presentence probation report available to the defendant and his attor-

ney. But this is not a seminar. The function of a Court of Appeals is to determine questions of law. In the instant case the defendant has assigned as a ground of reversible error the failure to furnish him with a copy of the probation report before sentence. There was no error and that should end the matter. It is not for me as a member of this panel to catechize the sentencing judge nor, in the absence of abuse which amounts to error, to suggest his discretion should have been exercised in a different manner.

With respect to Verdugo's second ground of error, the majority opinion engages in a lengthy discussion of the circumstances surrounding the search of Verdugo's home which resulted in the discovery of large quantities of narcotics. This discussion is irrelevant to these proceedings and only serves to cloud the issue by injecting emotion into the argument. No one presently contends that the search and seizure were legal. A motion to suppress this evidence in the case against Verdugo was granted and the evidence was not used in determining his guilt. The question on appeal is whether evidence which admittedly cannot be, and was not, considered in determining guilt, must also be excluded from consideration by the judge in determining an appropriate sentence for the convicted defendant.

The only authority (if it could be so characterized) cited by the majority for the proposition that the same Constitutional rights applicable to the determination of guilt are applicable to sentencing, is certain dicta of Judge Sobeloff in the case of Armpriester v. United States, 256 F.2d 294 (CA 4). From this slim reed the court is able to say that "Ours would seem an a fortiori case * * *" To make this remarkable jump it is necessary to avoid numerous cases. This is accomplished by

---

1. Notwithstanding this decision, Judge Browning has written a separate opinion supporting the position of the appellant.

2. For arguments favoring and opposing disclosure, see notes of Advisory Committee on Rules appended to 1966 Amendment to Rule 32 of Federal Rules of Criminal Procedure (Title 18 U.S.C.A.).

grouping a number of cases (see footnote 19 in the majority opinion) as support for the proposition that the scope of the sentencing judge's inquiry is broad and then concluding that such a "simple generality" cannot be utilized to justify the use of illegally obtained evidence. The various cases grouped under that heading in fact demonstrate in specific situations that the sentencing procedure is entirely different from the determination of guilt; that Constitutional rights applicable at trial are not always applicable to the sentencing procedure, and that much specific evidence and other information not admissible at trial may be considered by the sentencing judge. Surely the term "simple generality" is a misnomer when applied to the clear and unmistakable authority pronounced in these cases.

Despite the fact that there is no authority, either Constitutional or statutory, granting appellate jurisdiction to review the trial judge's exercise of discretion in the area of sentencing so long as the sentence is within the statutory maximum and no procedural errors are shown (Bowman v. United States, 350 F.2d 913, 917 (CA 9)) and notwithstanding the teaching of the Supreme Court (Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079) that the exclusionary rule has no application to the sentencing process, the majority seeks to burden this circuit with an innovation which can only result in confusion for sentencing judges.

In Williams v. New York, supra, the appellant was convicted of murder in the first degree and the jury recommended life imprisonment. A presentence report which contained much unfavorable matter with regard to the background and past criminal record of the appellant, was reviewed by the trial judge. The appellant was not permitted to either confront or cross-examine those persons who had provided the information disclosed in the report. The trial judge sentenced the defendant to death. The appellant argued to the Supreme Court that his rights under the Sixth and Fourteenth Amendments were violated when the sentencing judge considered the report without giving him the opportunity for confrontation and cross-examination. This argument was rejected by the Supreme Court. *The Court noted that sentencing is entirely separate from the determination of guilt. In sentencing, the object is to obtain the fullest information on the background and character of the convicted defendant so that the interests of the defendant and of society may be protected by the imposition of an appropriate sentence.* The Court went on to hold that the Constitutional rights of the defendant to confront and cross-examine were not applicable to the sentencing procedure.

Surely the type of Constitutional right involved has nothing to do with the basic principle that sentencing is, and should be, a separate process from the determination of guilt. The same reasons for applying different standards which guided the Supreme Court in Williams v. People of State of New York, supra, are applicable here. There is no reason to say that the Fourth or Fifth Amendment rights of this defendant have any higher standing than those Constitutional rights which have consistently been held inapplicable to the sentencing procedures. *As was pointed out in Williams, the distinction between sentencing and the determination of guilt was made to insure that the sentencing judge had the best available information before him.* The information the majority would exclude in our case is just the sort of information which should be before the judge. This information is known to be reliable, whereas information obtained in the absence of confrontation and cross-examination is far less so. Yet, even with the less reliable information, the Supreme Court has held in favor of the broad inquiry by the sentencing judges. The right to confront and cross-examine is one of the most fundamental at trial, and yet it was not extended to the sentencing procedure. There is likewise no reason to extend the search and seizure protections to the separate procedure of determining sentence.

Under the order of the majority, Verdugo is to be resentenced without consideration of the seized evidence. Of course the Court does not say that the sentencing judge may not consider the statements made in the presentence report. The probation officer reports that Verdugo has a reputation as one of the major sources of heroin in the Mission District of San Francisco, and has built up a large organization distributing heroin for him. The report includes many statements as to Verdugo's drug trafficking and other nefarious activities.

Where did the probation officer get this information? Did he interview law enforcement officers including those who searched Verdugo's home without a search warrant? Did he talk to some of the narcotic buyers? Did he talk to some of Verdugo's peddler employees? Did he observe the marked money and narcotics which were seized in Verdugo's residence? Did he interview the proprietors and customers in the dives where Verdugo and his peddlers operated? Does the majority intend the judge who sentences Verdugo to hold a hearing contrary to the holding in *Williams*, supra, to determine the sources of the probation officer's information—or is it still alright as long as it reaches the judge second-hand by way of hearsay?

Sentencing a defendant is not a pleasant task at best. To deprive a judge of information which would aid him in determining a just and proper sentence is intolerable. As the Supreme Court stated in *Williams*, at 249–250, 69 S.Ct. at 1084 "To deprive sentencing judges of this kind of information would undermine modern penalogical procedural policies that have been cautiously adopted throughout the nation after careful consideration and experimentation. We must recognize that most of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if information were restricted to that given in open court by witnesses subject to cross-examination. And the modern probation report draws on information concerning every aspect of a defendant's life."

No other circuit has cast this burden on the district judges and I do not agree that this one should—at least until this innovation has been considered by a court composed of all of the circuit judges.